JOHN MAHER v. DONK BROS. COAL & COKE COMPANY, Appellant.—
20 S. W. (2d) 888.

Division One, September 13, 1929.

800

802

*Rassieur & Goodwin* for appellant.

*Foristel, Mudd, Blair & Habenicht* for respondent.

GANTT, J.—This case came to me on reassignment. Plaintiff sought to recover from Donk Bros. Coal & Coke Co., William Houser, Lloyd Maritz, Bernard Susman and Bessie Susman damages for personal injuries.

About 10:30 A. M. December 31, 1923, Mrs. Susman gave an order, by telephone, to defendant company for the delivery of twelve tons of coal to her residence at 7200 Westmoreland Drive, a street running east and west, in University City. The company accepted the order and referred it to its Forsythe yard for attention. The company delivered no coal from that yard in its vehicles, but had others to make the deliveries. On receipt of the order at said yard the company called on Houser, who was in the hauling business, for a truck. Houser sent one of his men to the yard with a truck and tools for loading and unloading coal. On arrival the driver of the truck loaded it with coal pointed out to him by the weighman; the coal was weighed and scale tickets given to the driver. A wheelbarrow and shovel for use by the men wheeling the coal from the street into the basement were then loaded on the truck and the driver directed to haul the coal to 7200 Westmoreland Drive, give a ticket to the purchaser and have her sign the other ticket, and turn it in to Houser or the yard office. The coal was hauled as directed and dumped in front of the residence, so that about one-half of the coal was on the lawn between the walk and the curbing and the balance in the street. At the request of the driver, Mrs. Susman signed the scale ticket. The truck was then driven to the yard, again loaded with coal, weighed, and scale tickets given to the driver. By direction of the weighman the driver loaded on the truck some "runboards" for use in wheeling the coal up to and over the walks to the basement. The second load was hauled as directed and dumped in the street in front of the residence, so that the coal extended from the south curbing to the middle of the street. It was then dark, and after Mrs. Susman signed the ticket for the second load, the truck was driven to Houser's where the driver gave the tickets to Houser. Thereafter and about 6:45 P. M. on that day an automobile driven eastward on the south side of Westmoreland Drive by the defendant Maritz ran into the coal in the street in front of said residence, which caused the automobile to swerve northward and collide with the automobile in which plaintiff was traveling, as a passenger, westward on the north side of Westmoreland Drive, thereby causing

plaintiff's injuries, for which he seeks damages. After the collision Mrs. Susman refused to sign the jobbers' tickets showing that the jobbers had satisfactorily delivered the coal from the street to the basement. Later she signed a statement on the back of the ticket that "your men have put the coal away."

At the close of the evidence for plaintiff the suit was dismissed as to defendants Bernard Susman and William Houser. The jury found in favor of plaintiff and against Donk Bros. Coal & Coke Company for $20,000, and in favor of defendants Lloyd Maritz and Bessie Susman. The company appealed. It was charged with negligently obstructing travel on the street by dumping coal thereon and negligently permitted the coal to there remain in the nighttime without warning the traveler of danger by placing on or about the coal red lanterns—all in violation of an ordinance. Said acts of the company were also charged to be common-law negligence. The answer of the company was a general denial. On submission, plaintiff abandoned the charges of common-law negligence and the case submitted on the charges of negligence based on the ordinance, which follows:

"No person, firm or corporation shall at any time obstruct or occupy with building materials, soils, or any other object, calculated to prevent free passage of the public, more than . . . one-third of any public roadway, highway or alley.

"No person, firm or corporation shall permit or suffer any building materials, soil or other object, calculated to obstruct free passage of the public, to stand on any street, alley or sidewalk during the nighttime, without placing or causing to be placed on or about such obstruction red signal lanterns, which lanterns shall be maintained lighted from six o'clock P. M. of each day until six o'clock A. M. of the following day until such obstruction be removed."

Other facts will be noted in the course of the opinion.

I.   Defendant company contends its demurrer at the close of all the evidence should have been sustained, for the reason "the coal was placed in the street by one who, as a matter of law, was an independent contractor and for which acts appellant is not liable."

The identical question was under review by the Supreme Court of Indiana in Sargent Paint Co. v. Petrovitzky, 124 N. E. 881. Many of the cases dealing with the question were considered, and the rule well stated, as follows:

"The rule that one who employs a servant to do his work is answerable to strangers for the negligent acts or omissions of the servant committed in the course of the service is elementary. But,

however, clear as the rule may be, its application to the varied affairs of life is not always easy, as the facts which place a given case within or without the rule cannot always be ascertained to a certainty. When the attempt is made to impose upon the master the liability for the consequences of the servant's neglect, it sometimes becomes necessary to ascertain who was the master at the very time of the negligent act or omission. One may be in the general service of another and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person, with all the legal consequences of the new relation. The true test in determining who the master is, in a case of this character, is, not who actually did control the actions and movements of the servant in doing the work, but who had the right to control.

"If appellant was not the owner of a truck and did not have any person in its employ who could do its hauling and delivering, it had the right to enter into an agreement with Perkins to furnish a truck and man to do this work. If in this case Perkins furnished the truck and driver to do appellant's work, and placed the driver (Hays) under the control of appellant in the performance of that work, Hays became *pro haec vice* the servant of appellant. But, on the other hand, if the agreement was that Perkins should himself do the work for a consideration, with servants of his own selection, retaining the direction and control of such servants, he would be the master and liable for the negligent acts of such servant in doing the work, though the work was being done for the ultimate benefit of appellant. In determining who is the master, we must inquire whose is the work being performed. As before stated, this is answered by ascertaining who has the power to control and direct the servant in the performance of the work."

In determining the question, we consider the testimony of defendant Houser together with other facts. Houser testified as follows:

"On December 31, 1923, I furnished Donk Bros. Coal & Coke Company trucks which I own. At the request of the yardman at the Forsythe yards of Donk Bros. I sent a truck out to the Forsythe yards. John Oden was the driver. I told him to take a truck and go to the Forsythe coal yard of Donk Bros. I did not give him any orders to deliver a load of coal at the Susman residence at 7200 Westmoreland, or any order with reference to the kind of coal he should deliver there. He left the garage about half past one or two driving a Federal five-ton truck, which measured about fourteen feet from bumper to rear end."

Cross-examination: "I own six trucks of that type, and had a separate chauffeur for each truck. While Oden was working for me he hauled sand and gravel and cement. We sold the sand and gravel and brought it from the railroad yards and delivered it to my customers. I had no yard of my own, but bought from various dealers and furnished material to various customers of mine. In the winter of 1923 I would send trucks to Donk Bros. yards at their request two or three times a week to haul coal. I would send trucks wherever they rang for them and gave orders. When I would send a man to one of the yards I would send a man in a truck with a coal shovel and coal fork, all of which I owned. My name and address was on one side of the truck. I would just tell the driver to go to the yard and would not tell him to do anything. I never gave the driver an order, only to take the truck to the yard. I did not instruct my drivers when they were hauling coal from Donk Bros.' place to the customer that they should deliver wherever the customer told them, or to dump it wherever the customer told them to dump it. I paid John Oden for his day's work on the 31st of December, 1923. I paid him $24 for the entire week. When he was finished with his deliveries of two loads of coal from Donk Bros. to 7200 Westmoreland he brought me in two tickets. I copied them in a book and put them in an envelope and sent them to Donk Bros. That was my universal custom in such cases."

Defendant company then read in evidence the deposition of Houser, which follows:

"I am a material dealer and contractor. In the winter time I am in the hauling business. I furnish my trucks out for any kind of work I can get. I have a fleet of eight heavy trucks. I have been hauling off and on for Donk Bros. for the last twenty years. I never had any particular arrangement with them. I get so much a ton for all the stuff I deliver. When I furnish Donk Bros. a truck their name does not appear on it. Only my name and address is on it. About a year ago I remember that they telephoned to send them a couple of trucks. I did so. I did not know at the time where the coal was to be delivered or whether it was a residence or steam haul. I got the telephone between 12:30 and one o'clock. The trucks came back about dark. I told the driver to go out to Donk Bros.' Forsythe yard; 'they want you to haul coal;' they were under the weighmaster's orders for Donk Bros. Coal & Coke Company. When I furnished a truck to Donk Bros., I furnished a truck and driver. The drivers are required to load their own load and dump it themselves. They have nothing to do with the storing of the coal. If they make a delivery to a steam customer, if they can't dump the coal into a chute they have to shovel it in. The same applies to

residences if they have a chute and want it in, then the driver will put it in, otherwise they dump it in the street. These practices have grown up over a long period of custom. I had no arrangement with Donk Bros. with reference to the manner in which the coal should be hauled or delivered. If the coal had to be stored in the cellar at 7200 Westmoreland, and it was impossible to unload the coal from the truck into the cellar, the coal would be dumped according to the instructions of the purchaser. Sometimes the street dump is better than an alley dump, and sometimes an alley dump is the best. The driver takes instructions from the people who is buying the coal. After the coal is dumped, the driver has nothing to do with the removal of the coal into the storage bin. I always instruct my drivers to get the dray tickets signed. I gave them the instruction, not Donk Bros. The dray tickets are delivered to me if it is the last load at night and it would be out of the way for the driver to go back to the yard. If he don't go back, the next morning I mail it to them. The tickets have the name of Donk Bros. stamped on them with a little stamp. The drivers report the weight they haul on each load. I keep a record of them and after thirty days Donk Bros. send me a report of the coal hauled, and I get so much a ton. If it was getting late at night and getting dark and it was still too early to quit and Donk Bros. wanted the driver to deliver a load of coal in the dark, that would not be done. I haven't any lanterns or lights on my trucks. Donk Bros. have never furnished any drivers with a lantern to be put on coal after it was dumped. The weighmaster makes out the dray tickets with the kind of coal, amount, and the name and address of the purchaser thereof. I got the telephone call from the weighmaster at Forsythe about half past twelve. The truck was on the road ten minutes later. It would take about an hour to go to Clayton and thirty or forty minutes to load. The drivers do the loading and Donk Bros. do not assist them. The truck returned to my place of business a little after dark —five or five-thirty. In the material business we say 'dump it where they want it and get the ticket signed.' Donk Bros. required that I send the tickets back to them signed; otherwise, if we send them back without being signed, then they would send and get them signed. The only purpose of the ticket ever reaching me was to take off the gross and tare and net weights. The manner in which coal is dumped is created by custom in the city of St. Louis. It is dumped in the street or shed or steam plant as the occasion requires.''

Cross-examination: ''The driver gets the tickets from Donk Bros. when they haul coal for them. My instructions are to get them signed after the coal is dumped, and they take the tickets to the weighmaster. I only have them when it is late at night and then

mail them back to Donk Bros. The drivers never have occasion to deliver coal for Donk Bros. when the people give no instructions about where to put it. The drivers would not dump coal without instructions. If the purchaser says to dump it in the street, they do so regardless of how much they put on the load and regardless of how many loads they haul. After the dump, they have the tickets signed and leave. I never dump any coal at night. When the drivers deliver coal they have a block and shovel furnished by me. They generally get in about five or five-thirty and I pay them by the day. The truck that went to Donk Bros. did not unload automatically. Donk Bros. have no control over my drivers so that they could hire or fire one of them. If the driver did something they didn't like, they would just say, 'Take the truck in, I don't want you.' I have known that to be done. My men are under the orders of Donk Bros. when they go out with my trucks to haul for Donk Bros., and they will follow the instructions of Donk Bros., but they would ask the people at the residence first where they wanted the coal. They have instructions from me to always find out where the people want the coal. On this particular day I told Oden to go to Donk Bros.' Forsythe coal yard. I don't remember whether it was the 31st of December, or not. I can't identify the particular day or time. I have been dealing with Donk Bros. for about twenty years. When I first started dealing with Donk Bros. I talked with the weighmaster about terms. I don't remember their names. They were employees of Donk Bros., hired and paid by them. Whenever I had any dealings with Donk Bros. I would deal with the weighmaster at that certain yard, and Donk Bros. would pay me for what I did. I have never talked with the officers of Donk Bros. The weighmaster discussed the terms and hired the truck. About the close of the war, the last rate, seventy-five cents steam and one dollar private families, went into effect. I talked with a coal weigher named William Levering at Olive Street Road and Hodiamont Avenue working for Donk Bros. He was a carload salesman.''

The evidence is not conclusive as to who had the power to control and direct the driver while he was working on the delivery of the coal. There was no contract binding the company to furnish Houser with deliveries, and there was no contract binding Houser to make deliveries for the company. It used the services of others in making deliveries, and Houser could not complain. Houser could have refused to make deliveries for the company and it could not complain. The evidence tends to show there was only an arrangement for trucks and drivers. Indeed, Houser testified there was no ''particular arrangement'' about hauling coal. [Muncie & Co. v. Thompson, 123 N. E. 196.] He also testified that after ordering the driver

with the truck to defendant's yard, he gave the matter no attention, which tends to show the control of the driver and truck was left solely to the company. Only a few directions were necessary to bring about a delivery and they were given by the company.

Attention is directed to the testimony of Houser that he instructed his drivers to dump coal where the purchasers wanted it dumped, and that his drivers would not deliver coal after dark though requested to do so by the company.

This evidence is stressed as showing conclusively the company did not control the drivers in the performance of the work. It is certain the evidence is not conclusive. A direction by Houser to dump the coal as directed by the purchaser was a useless order, for the company would make all deliveries according to agreement with the purchaser. Therefore, the driver would inquire of the purchaser where the coal should be dumped. Besides, Houser also testified that after ordering the driver to the company's yard he gave the matter no further attention. Under these circumstances a jury might not believe Houser's testimony that he directed his drivers as to dumping coal. And the testimony that his drivers would not deliver coal after dark could not be conclusive, for on the occasion in question the driver did deliver a load of the coal after dark.

Defendant cites O'Hara v. Laclede Gas Light Co., 244 Mo. 395, 148 S. W. 884; Fink v. Missouri Furnace Co., 82 Mo. 276; Sluder v. Transit Co., 189 Mo. 107, 88 S. W. 648; Neuschaefer v. Sand & Stone Co., 180 N. Y. Supp. 413; Singer v. McDermott, 62 N. Y. Supp. 1086; Philadelphia & R. Coal & Iron Co. v. Barrie, 179 Fed. 50.

As we understand the Philadelphia & R. Coal & Iron case, it is an authority against defendant, and the rulings made in the other cases cited rest on facts wholly different from the facts of the case at bar.

The question was properly submitted to the jury. This conclusion is sustained by Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 253 S. W. 367; Burgess v. Garvin, 219 Mo. App. 162, 272 S. W. 108; Aubuchon v. Construction Co., 291 S. W. 187; Kimball v. Cushman, 103 Mass. 194; Philadelphia & R. Coal & Iron Co. v. Barrie, 179 Fed. 50, 7 Am. Cas., note, p. 101; 18 R. C. L. 784; 39 C. J. 1274.

The company also contends its demurrer should have been sustained for the reason "the defandent had the right to make delivery

**Warning Lights.** of the coal in the street and no duty rested on said defendant to place barriers or warning lights thereon."

Defendant cites as supporting this contention Searcy v. Noll Welty Lumber Co., 295 Mo. 188, 243 S. W. 318; O'Hara v.

Laclede Gas Light Co., supra; Philadelphia & R. Coal & Iron Co. v. Barrie, supra; Neuschaefer v. Sand & Stone Co., supra. The last three cases do not touch the question. Undoubtedly an abutting proprietor has the use of the street for the delivery of coal. [Press v. Penny & Gentles, 242 Mo. 98, 145 S. W. 458; Searcy v. Noll Welty Lumber Co., supra.]

In the Searcy case the delivery of coal on the street "completed the sale," and title passed from defendant coal merchant to the purchaser. But in the instant case the evidence tends to almost conclusively show that defendant contracted to deliver the coal in Mrs. Susman's basement. Even under those circumstances the defendant could occupy the street in making the delivery to the basement, but it must be done under the conditions imposed by ordinance. [Lindman v. Carroll, 308 Mo. 187, 271 S. W. 512.]

The company also contends its demurrer should have been sustained for the reason "its liability, if any, was terminated by the direction of Mr. Susman to dump the coal in the street, and she thereby and thereupon assumed exclusive control and custody of the coal." If she so directed it was no evidence of dominion over the coal, but dominion over the lawn. While the driver of the truck testified that Mrs. Susman told him not to dump the coal on the lawn but to dump it on the street, the men wheeling the coal to the basement only testified that Mrs. Susman told the driver not to dump the coal on the lawn. Furthermore, Mrs. Susman denied on direct examination that she gave such order, and on cross-examination said she had no recollection of such a conversation.

In this connection it is argued that Mrs. Susman by causing red lights to be placed on the coal in the street, after the collision, recognized the fact that she assumed dominion over the coal when she directed the driver to dump it on the street.

There is no evidence to sustain this contention. The only evidence on the question was given by Chandler, a police officer, who testified: "I observed the coal in the street in connection with the light. It was out in the middle of the street, scattered over, and I had the jobber push it over the sidewalk and get a red light and put it on there." Later he testified: "I spoke to Mrs. Susman or Mr. Susman, I'd not say which now, and told them to have a light put on there. I don't know where they got the light they put on there. There was none on there prior to that time." Mrs. Susman testified: "I didn't furnish any red lights or signals to put on the coal."

It is also claimed that Mrs. Susman acknowledged delivery by signing the scale tickets presented by the driver of the truck. On this record, the signing of the tickets was only notice to the company

and Houser that the driver had performed his part of the delivery. The signing of the tickets was solely for the benefit of the company, Houser and the driver. The demurrer was well ruled.

II. At plaintiff's request, the court directed the jury, in instruction numbered 2, that if defendant company occupied more than one-third of the street with the coal, it was negligent; and if defendant Maritz while traveling eastward on the street ran into the coal and the collision was thereby caused and plaintiff thereby injured, and that the collision and injury were directly caused or contributed to by such negligence, the finding should be for the plaintiff and against the defendant company.

Defendant company concedes there is substantial evidence that the ordinance was violated in occupying more than one-third of the street with coal, but contends there is no evidence tending to show a causal connection between this negligence and the injury to plaintiff. It directs attention to the testimony of defendant Maritz that he was driving about five feet from the south curb when he ran into the coal. From this it argues that the car driven by Maritz ran into the coal within the one-third area lawfully occupied, and, therefore, the coal beyond the lawful area could not have caused or contributed to plaintiff's injuries. But defendant overlooks the testimony of Maritz that when his car hit the scattered coal and the car was thrown this way (indicating), and the moment the car hit at the place indicated the collision occurred. Defendant also overlooks the testimony of Sidney Butcher, that when he first saw the car driven by Maritz it was on the south side of the street where the eastbound traffic was driving, and that he then noticed said car "suddenly swerved over but didn't know how many swerves the car made;" that it made "some kind of an awkward move, sorter zigzag, first one way and then the other." Defendant also overlooks the testimony of Wade Dudley, that he didn't see the accident but heard it; that when he went to the street he saw where the car driven by Maritz had "run up on the coal and struck a big lump;" that he "could see the mark of the car where it kind of run upon the coal pile and off in the street, and that lump wasn't there before; I had that all cleaned up; the lump of coal was about three feet north of the coal pile and I didn't know whether the lump rolled down before these machines came along or not."

From this evidence the jury could infer that defendant Maritz ran into the coal about five feet north of the south curbing; that his car was thereby suddenly deflected northward and into the scattered coal beyond the area lawfully occupied so that Maritz

could not control the car and avoid the collision. This is substantial evidence tending to show the coal beyond the lawful area caused or contributed to plaintiff's injury.

It is claimed the instruction "assumes that the presence of the coal occupying more than one-third of the roadway had a causal connection with the accident and injury to plaintiff."

The contention is without merit, for the instruction required a finding "that said collision and injury to plaintiff were directly caused or contributed to by such negligence on the part of said defendant Donk Bros. Coal & Coke Co. in so placing said obstruction in the street."

It is also claimed the instruction assumes the persons engaged in delivering the coal were servants of defendant company.

The instruction directs a finding that the coal was ordered, the order accepted, and the coal, pursuant to said order, delivered by defendant company by and through its agents and servants. So, to find for the plaintiff the jury must find the persons handling the coal on the delivery were the servants of defendant company.

Defendant criticises the use in the instruction of the clause "and the said coal was, pursuant to such order, delivered by the defendant Donk Bros. Coal & Coke Co. by and through its agents and servants engaged for that purpose by Donk Bros., if you so find, to the said defendant Susman."

It is argued "that if the jury find the above to be a fact, and it is not disputed, they automatically find that Houser was Donk Bros. agent or servant."

This contention is also without merit, for, as stated, the jury was required to find all the persons handling the coal on the delivery were the servants of defendant company.

III. Defendant complains of instruction numbered 3 authorizing a recovery if it negligently failed to warn the traveler of the obstruction by red lanterns.

The same objections are made to this instruction as to the instruction just reviewed. For the reasons there given such objections to this instruction are overruled.

In addition, defendant directs attention to the use of the words "agents or servants" in this instruction. It claims the use of the disjunctive tended to confuse the jury, and it argues that the jury might have concluded that Houser was an independent contractor as to the manner of delivery and also an agent as to general results. We do not think so. If Houser was an independent contractor he was not an agent. The word agent as used means a person in the service of another. The contention is overruled.

Further, defendant claims these instructions ignore its defense, that the title to the coal passed to Mrs. Susman when the coal was dumped on the street.

In ruling the demurrer we held the direction of Mrs. Susman to the driver not to dump the coal on the lawn was no evidence of an intention to change the contract for a delivery in the basement.

IV. Defendant company challenges an instruction give at the request of Mrs. Susman, for the reason the instruction amounted to a directed verdict against the company in so far as its defense that Mrs. Susman changed the contract by directing the driver not to dump the coal on the lawn.

The instruction directed a verdict for defendant Bessie Susman if the jury found that she ordered the coal from defendant company to be delivered in her basement, then until the coal was so delivered she had no supervision or control over the same. If erroneous, the defendant company cannot avail itself of the error, for the instruction defines the rights of a codefendant. [Clark v. Railroad, 234 Mo. 396 l. c. 424, 137 S. W. 583; O'Rourke v. Lindell, 142 Mo. 352, 44 S. W. 254; Beave v. Transit Co., 212 Mo. l. c. 355, 111 S. W. 52; Wiggin v. St. Louis, 135 Mo. 558, 37 S. W. 528.] Furthermore, in overruling the demurrer we held there was no substantial evidence tending to show that Mrs. Susman changed the contract by directing the driver not to dump the coal on the lawn.

V. Defendant complains of the refusal of its instruction withdrawing the charge that the company negligently, carelessly and in violation of law obstructed and occupied more than one-third of the street with the coal. For the reasons stated in reviewing Instruction 2 and in ruling the demurrer, the instruction was properly refused.

VI. Defendant complains of the refusal of the instruction withdrawing the charge that defendant company negligently occupied an unreasonably large portion of the street in the nighttime which constituted an unreasonable interference with travel. The contention is without merit, for the case was submitted solely upon the charges of negligence resting on the ordinance. [Burton v. Phillips, 7 S. W. (2d) 712; Dietzman v. Screw Co., 300 Mo. 196, 254 S. W. 59; Johnson v. Railway, 259 Mo. 534, 168 S. W. 513.]

VII. Defendant complains of the refusal of its instruction, that if the jury believed the pile of coal could have been seen by a person with normal eyesight, if looking, and if defendant Maritz failed to see the coal, or seeing it, ran into it, then the verdict should be for the company. If the instruction had directed a verdict for the company, if the jury believed the negligence of the defendant Maritz was the sole cause of the collision, it would have been proper. It directs a verdict for the company if defendant Maritz was negligent, even though they believed the negligence of the company contributed to cause the collision. For this reason the instruction was properly refused.

VIII. Defendant complains of the refusal of its instruction, that even though the jury believed barriers and red lights were not placed about the coal, yet if they further believed said failure did not directly contribute to cause the collision, then the plaintiff was not entitled to recover on account of damages resulting from any violation of the ordinance. The instruction eliminates the issue of unlawful obstruction of the street beyond the one-third area fixed by the ordinance. For this reason the instruction was properly refused.

IX. Defendant complains of the refusal of its instruction, that if the jury believed Mrs. Susman ordered the coal and the defendant delivered the coal in front of her residence and she signed scale tickets acknowledging receipt of the coal, the title to the coal passed to Mrs. Susman. If given this instruction would have directed a verdict for the company. For the reasons stated in ruling the demurrer, this instruction was also properly refused.

X. As tending to prove the contract defendant offered to prove that in delivering coal it was customary to deliver the coal in the street or alley unless the wagon or truck could be spotted near the residence and the coal shoveled to the basement. The court rejected the evidence, and of this the defendant company complains. No authorities are cited to support the contention, and we suspect none could be found. The authorities are to the contrary. [4 Jones on Evidence (2 Ed.) pp. 2876 and 2872; Starosky v. Publishing Co., 235 Mo. 67, 138 S. W. 36; Bates v. Forcht, 89 Mo. 121, 1 S. W. 120; Pyrtle v. Shoe Co., 291 S. W. 172; Turner v. King, 224 S. W. 91; Hefernan v. Neumond, 198 Mo. App. 667, 201 S. W. 645; Paramor v. Lindsey, 63 Mo. 63;

Hoyt v. Stock Yards Co., 188 S. W. 106; Stagg v. Ins. Co., 77 U. S. 589, 19 L. Ed. 1038; Star Piano Co. v. Morrison, 159 Mich. 583; Brown v. Foster, 113 Mass. 136; Catlin v. Smith, 24 Vt. 85; Hutchings v. Ladd, 16 Mich. 493.]

XI. Defendant complains of the amount of the verdict. Plaintiff was forty-six years of age and had been a clerk for the Southern Railway, in East St. Louis, for twenty-three years. He suffered a scalp wound, a small cut in the side, and his left hand was cut by glass and the wrist almost severed. The scalp wound and cut in the side were minor injuries and soon healed. As a result of the injury at the wrist, the plaintiff has permanently lost the use of his left hand. The fingers are contracted and cannot be straightened—they are stiff and without feeling. While the thumb is not wholly stiff, the stiffened and crooked fingers prevent its use. He was in a hospital three weeks and thereafter visited the office of his physician for treatment, until the middle of April. His medical and hospital expenses amounted to $839. Because of his long and faithful services to the railroad his salary was paid during the time he was out of service. He resumed his position with instructions that he do only such work as he felt able to do, and his assistant relieved him of most of the work. If he should lose his position he would have difficulty in procuring another. He suffered great pain during the time he was in the hospital and while being treated. Thereafter he suffered from pains originating in the wrist and extending up the arm and sometimes into the shoulder, and at times is unable to sleep. An operation to relieve the pain would be only an experiment and attended with danger. The only relief is to bake the hand and arm in an oven.

While the plaintiff suffers as indicated and may continue to do so, still we think the amount of the verdict excessive. Considered with reference to sums allowed for similar injuries, we believe the verdict is excessive in the sum of $7500. Therefore, if the plaintiff, within ten days, enters a *remittitur* in the sum of $7500 as of the date of the judgment in the trial court, the judgment is affirmed as of said date in the sum of $12,500; otherwise the judgment is reversed and the cause remanded. All concur.