STATE OF MISSOURI at the relation of LIONEL J. CHAPMAN, Relator, v. HOPKINS B. SHAIN, EWING C. BLAND and NICK T. CAVE, Judges of the Kansas City Court of Appeals, and EVA PERDUE.—147 S. W. (2d) 457.

Division Two, February 1, 1941.

*George E. Kimball, Amos A. Knoop* and *Walter A. Raymond* for relator.

*Frank Aylward, James R. Sullivan* and *Arthur R. Wolfe* for respondents.

ELLISON, J.—Certiorari to the respondent Judges of The Kansas City Court of Appeals bringing up for review their record in Perdue v. Chapman, 137 S. W. (2d) 483, on the ground of conflict with our decisions. Relator, Chapman, was harvesting a crop of alfalfa hay from a field in North Kansas City and having it trucked to his farm near Lees Summit, a distance of about 20 miles. One of the trucks so engaged belonged to a man named Bradley and was being driven by his employee Buckley. While the latter was transporting a load of alfalfa to the farm a flat tire developed. He left the truck standing partially on the pavement and departed to get a new tube. An automobile in which plaintiff was riding collided with the parked truck, resulting in injury to her.

She sued the relator, Chapman, for damages and recovered a judgment for $1500 which respondents affirmed, holding there was sufficient evidence to take the case to the jury on the issue whether the relation of master and servant existed between Chapman on the one hand and Bradley's employee, Buckley, on the other. Relator contends the evidence conclusively showed Bradley was an independent contractor, and that respondents contravened our decisions on similar facts in holding to the contrary. This is the only issue presented. We shall sketch the facts stated in the opinion, but the reader will profit by referring to the full report thereof.

The harvesting operation was large. Relator used his own motor driven cutter with elevator attached to cut and load the hay into trucks which would drive alongside under the elevator until filled and then make way for another, thence proceeding to the farm independently—that is, not in convoy. On an average each truck made two or three trips per day. Relator used three of his own trucks and did not obtain Bradley's services until the morning of the third day when one truck was secured. The hay was green and would spoil unless it was transported to the farm with dispatch and placed in the silo. That was the understanding with all the loaders and haulers. In the afternoon of that day relator's foreman engaged another truck, the one figuring in the collision.

The evidence as to the contract between relator and Bradley is meager. The latter had conducted a hauling business for some time at a fixed price per job by measure, weight or load, but he had no State permit as a contract hauler. Buckley had been employed by him for many years. Relator first talked to Bradley the second day of the harvesting, stating he wanted more large trucks and did not expect to pay by the load. (Bradley had hauled hay for relator the year before for $5 per load.) Bradley said he would be at the field the next morning, but there was no agreement as to pay (he "figured" on about $1 per ton) and he did not consider himself under contract. When he appeared at the field with one of his trucks relator was not there, although he had promised to be; but a man in charge of the cutter asked Bradley if he "could catch a load" and the latter answered in the affirmative and went to work. No further instructions were given him because he was familiar with the routine from his experience the year before. After one trip to the farm had been made with that truck relator's foreman asked for the second truck and Bradley had Buckley drive it.

Nothing was said in the conversation between relator and Bradley concerning the former's right to control the details of the latter's operations. After the work was done relator settled with Bradley on the basis of $1 per ton. The opinion says: "It may be that the conduct of the parties shows that the defendant (relator) employed Bradley to haul the hay at $1 per ton." It also quotes relator's testi-

mony: "I let this contract to Mr. Bradley for hauling the green hay from North Kansas City to Beverly Farms." Bradley operated his own trucks, bought his own tires, gasoline and oil, and made his own repairs. There is no evidence that relator paid for the repair on the punctured tire. The evidence stated in the opinion is also clear that Bradley selected his own employee, Buckley, and substituted the latter for himself in driving the first truck in the morning.

There were six or seven routes to the farm and when Buckley started out in the morning with the first load he was asked by one of the men running the cutter if he knew the way. He answered that he did, from the preceding year, and the man replied "follow the same old route if I knew it out there." The year before the defendant had guided Buckley on his initial trip by driving in front of him over the same road. However, on the day of the collision two of relator's three trucks were seen on another road, which the opinion says, "probably was a partial deviation from the regular route." During that day relator assisted in harvesting the hay and drove back and forth from his farm. He testified in a deposition that he "just drove over there (to the field) to see how they were getting along. Overseeing the work to some extent." While the truck involved in the collision was parked, one of relator's passing trucks stopped and the driver said he would proceed to the farm, unload his hay, and return to give assistance. One of relator's other employees who had heard the truck was stalled, came to the rescue in another truck and helped in transferring the hay thereto, whence it was transported to the farm. He had not been sent by relator or his manager, but relator came to the scene while the employee was there. Relator then went to his farm and directed his manager not to wait "for this load of alfalfa." But he returned to the truck and directed the employee to take the hay to the farm.

As regards the control exercised by relator and his employees over Bradley and Buckley in the loading and unloading operations, the following is stated in the opinion. Relator was not present at the hayfield any time when Bradley and Buckley were there. Neither of them had anything to do with loading the hay, save that they drove their trucks along under the elevator. Both were handled in the same manner as relator's drivers in respect to: taking their turn when the trucks were loaded under the elevator; the route followed; unloading the hay into the grinder and silo at the farm. However Buckley assisted relator's employees in pitching the hay into the grinder, and some of them told him where to drive up by the grinder. On the other hand there is definite evidence that Bradley did direct the activities of his servant Buckley. After the first load of hay was loaded in the morning, with Bradley handling the truck, he turned it over to Buckley to drive to the farm. In the afternoon when requested to furnish an additional truck, Bradley directed Buckley

to operate that truck. When the flat tire developed Buckley left the truck parked and departed to get a new tube. During his absence Bradley drove by, discovered the situation, and proceeded on to Raytown where he joined Buckley and took charge of the repair operations.

Respondents reannounce the general rule fixing the status of an independent contractor—that he must not be subject to the control of his employer as to the means by which the object of the employment is accomplished, but only as to the result. The prime test, they say, is the employer's *right* to control the method of work even though it actually may not be exercised. Then the opinion enumerates in paragraph (5), 137 S. W. (2d) l. c. 487, certain commonly recognized tests of the relationship, quoting from Sargent v. Clements, 337 Mo. 1127, 1133, 88 S. W. (2d) 174, 177, and Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 1012(5), 82 S. W. (2d) 909, 916(4). Since the decision of those two cases this court in 1937 adopted the definition of independent contractor formulated by the American Law Institute's Restatement of Agency, Sec. 2, which is as follows: "An independent contractor is a person who contracts with another to do something for him, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking." [Skidmore v. Haggard, 341 Mo. 837, 844(2), 110 S. W. (2d) 726, 729(5); Barnes v. Real Silk Hosiery Mills, 341 Mo. 563, 569, 108 S. W. (2d) 58, 61(2).]

The Skidmore case goes on to quote from Section 220 of the Restatement the "principal factors" to be considered in determining the relationship. Such of these as appear to have a bearing under the evidence stated in respondents' opinion, are: "(a) the extent of control which, by the agreement, the master may exercise over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; . . . (d) the skill required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; . . ." Another test, not included in this list but which is mentioned in the Sargent and Maltz cases, supra, is whether the employee may use his own assistants with the right to supervise their work. Still another important test stressed in Coul v. Peck Dry Goods Co., 326 Mo. 870, 874, 32 S. W. (2d) 758, 759, is whether the employee has the right to substitute another for himself in the performance of the prescribed duties.

Going back to respondents' opinion. They first point out evidentiary facts which indicate Bradley was an independent contractor, namely: that he was independently engaged in the hauling business; that he worked for relator on a contract basis at a fixed price for the job,

measured by tonnage; that he selected his own employees, furnished his own trucks, bought his own tires, gasoline and oil, and made his own repairs. These satisfy requirements (b), (g) and (e) in the list given in the Skidmore case. In addition, we may add that the facts stated in the opinion disclose the work did not require any special skill on the part of Bradley and Buckley. It consisted merely in driving the trucks under the elevator, receiving the hay and trucking it to relator's farm where they assisted his employees in pitching it into the cutter. Both men had been in the trucking business for a long time and had worked at this particular work the year before. They did not need special supervision. Bradley had one truck on the job for only one day, and the other for half a day. The duration of their employment was short. By these facts requirements (d) and (f) of the Skidmore case are satisfied. Further the undisputed facts show Bradley furnished his own employee Buckley, substituted him for himself, and supervised his work. This meets the test mentioned in the Sargent, Maltz and Coul cases, as referred to in the last paragraph. All these elements of proof point to the conclusion that Bradley was an independent contractor.

This leaves only factor (a) of the Skidmore case to be considered, viz., the extent of control which, under the contract of employment, relator exercised over the details of the work. Bear in mind that respondents' opinion states the contract between relator and Bradley was "very meager." In fact the verbal dealings between the two amounted to nothing more than a conditional arrangement for Bradley to furnish one or more trucks with drivers the next day. The existence of the contract and the terms thereof are inferred by respondents' opinion from what relator and his employees, on the one hand, and Bradley and his employee Buckley on the other, did by way of performance.

Respondents enumerate the following as facts tending substantially to show (when viewed in the light most favorable to plaintiff) that Bradley and Buckley were relator's servants and subject to his right of direction in their physical conduct: (1) since relator failed to meet Bradley at the hayfield as promised on the morning when the latter reported for work, it may be inferred relator by his action left to the hay cutters the final details of employment; (2) the action of one of the cutters in telling Buckley to take the road he had followed the year before if he knew it, could have been regarded by the jury as directive rather than informational; (3) the jury could have found relator reserved a right of control over Bradley's trucks in the hayfield and along the route to the farm because he drove back and forth over the road and was in the hayfield, "overseeing the work to some extent," as he testified, or to a material extent the jury could have concluded; (4) there was evidence tending to show relator was controlling, in a material measure, the operations of the haulers, in-

cluding Bradley and Buckley; (5) Bradley's two trucks and their drivers were handled in the same way as relator's trucks and drivers in taking their turn under the elevator, hauling the hay to the farm, and unloading it at the silo grinder; (6) his trucks had to conform to the operations in the hayfield; (7) the employment contemplated his trucks should average three trips per day; (8) it was understood the hay was to be transported and put immediately into the silo, which inferentially required Bradley and Buckley to assist in the unloading along with relator's employees, who were subject to his control; (9) when Bradley's loaded truck was disabled by the collision, relator furnished men and a truck to complete the transportation of the hay although Bradley had another truck which he would have used. (Earlier in the opinion it is stated that Hartvigsen, the employee who brought this truck, was *not* sent to the scene by relator or his manager, though relator finally ordered the hay to be taken on to the farm.)

Relator says the foregoing are mixed conclusions of fact and law conflicting with: O'Brien v. Rindskopf, 334 Mo. 1233, 1243, 70 S. W. (2d) 1085, 1089; Skidmore v. Haggard, supra, 341 Mo. l. c. 847, 110 S. W. (2d) l. c. 731; Coul v. Peck Dry Goods Co., supra, 326 Mo. 870, 32 S. W. (2d) 758; Ross v. St. Louis Dairy Co., 339 Mo. 982, 994, 98 S. W. (2d) 717, 723; Kourik v. English, 340 Mo. 367, 376, 100 S. W. (2d) 901, 904.

Respondents' opinion cognizes the Skidmore, Coul and Ross cases, but distinguishes them by saying the facts therein are less like those in the instant Perdue case than are the facts in three cited decisions of the Courts of Appeals where the relation of master and servant was held to exist. The opinion does not distinguish or mention the O'Brien and Kourik cases. In their brief here respondents' counsel distinguish all the cases cited by relator and defend the opinion on authority of earlier decisions of this court, to-wit: Clayton v. Wells, 324 Mo. 1176, 26 S. W. (2d) 969; Maher v. Donk Bros. Coal & Coke Co., 323 Mo. 799, 20 S. W. (2d) 888; Hoelker v. American Press, 317 Mo. 64, 296 S. W. 1008; Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 253 S. W. 367.

In examining respondents' opinion for conflict with the several cases cited we have in mind the rule that the facts in the compared cases need not be identical. It is sufficient if they are essentially similar, requiring the application of the same legal rules. [State ex rel. K. C. So. Ry. Co. v. Shain, 340 Mo. 1195, 1201 (1), 105 S. W. (2d) 915, 918.]

Considering first the four cases cited for respondents, we are unable to say their facts were such that respondents' opinion would have contravened them if respondents had held the other way—that is to say, had held the plaintiff failed to make a prima facie showing that relator was master and Buckley his servant. In the Maher case a general employer had furnished a truck and driver, and in the

Karguth case a team, wagon and driver, to the defendant Donk Bros. Coal & Coke Co., to haul orders of coal sold at retail by the latter, and it was held there was substantial evidence that the driver was the servant of Donk Bros. But in both cases the hauling operations were separate transactions, not parts of a larger operation, and the general employer of the drivers was not present participating in the hauling, did not know what kind of coal was to be hauled or where it was to be delivered, and therefore did not reserve control of the physical conduct of the drivers.

In the Clayton case a general employer furnished to the defendant Brick Company under written contract 30 teams and drivers to haul clay excavated from pits to defendant's clay shed as it might designate. The employer did not furnish the wagons, these being provided by defendant. The Clayton opinion states the apparent intent of the written contract was that the employer should merely furnish teams and drivers, not that *he* should gather and store the clay. And while the work was part of a larger operation, it seems to have been so complicated as to necessitate control by the defendant over the physical conduct of the drivers. The employer was not present.

In the Hoelker case the tortfeasor delivered specified numbers of newspapers to newsboys at designated points in St. Louis five times a day, over optional routes, using a motorcycle which he operated at his own expense. He was paid by the day and required to be at the newspaper office at fixed times to receive the papers. This court held it was a question for the jury whether he was the servant of the publisher, chiefly because the contract of employment called for the use of a motorcycle by him at fixed times between fixed points, and because the carrier was not engaged in the delivery of newspapers as an independent occupation. Of course the publisher was not present supervising the distribution of the papers.

We turn now to decisions of this court which clash with respondents' opinion according to relator's view. Relying on the fact that the opinion shows relator's trucker Bradley provided his own trucks, selected his own servant, Buckley, and substituted the latter for himself in driving one of the trucks, counsel for relator stress the following quotation from Coul v. Peck Dry Goods Co., supra, 326 Mo. l. c. 874, 32 S. W. (2d) l. c. 759:

''Personal service is a marked characteristic of the relation of master and servant. In the performance of his services Hubbs not only had the right to use his own or such other vehicle as he chose, but to employ another to drive the same. *The right of substitution does not connote personal service; on the contrary it is indicative of an independent contractual relation.* Certainly it cannot be said with an intelligent regard for the meaning of the relation that an employee *has or could have the power of substituting another for himself in the performance of his prescribed duties.*'' (Italics ours.)

Note the last sentence of the quotation declares the right of substitution cannot intelligently be regarded as compatible with the status or relation of employee. This is a broad statement meaning, as we interpret it, that the right of substitution and the relation of servant or employee cannot exist together in the same person. That ruling has not been modified in our later decisions, so far as we can find. On the contrary the first and third sentences of the excerpt are quoted in Rutherford v. Tobin Quarries, Inc., 336 Mo. 1171, 1177, 82 S. W. (2d) 918, 922(6); and Skidmore v. Haggard, supra, 341 Mo. 1. c. 847, 110 S. W. (2d) 1. c. 731, declares in substance that the right of a contractee to substitute vehicles with other drivers for himself is inconsistent with the idea of personal physical service.*

Again bearing in mind that the trucker, Bradley, had been independently engaged in the hauling business for a long time; that he had worked for relator Chapman the year before; that Chapman engaged him on the occasion in question for the special service of furnishing and operating at his own expense one or more trucks to haul alfalfa during the last day of the harvesting; that the work was simple and familiar to Bradley and his servant of long standing, Buckley; that Bradley substituted Buckley for himself in the operation of the first truck; that he selected and installed Buckley as the driver of the second truck; that he was present on the job, at times exercising control over Buckley; that relator also supervised the operations to some extent; that relator paid Bradley, not Buckley, for the work, and paid on a tonnage basis—remembering all these things we say, the case of O'Brien v. Rindskopf, supra, 334 Mo. 1233, 70 S. W. (2d) 1085, is noteworthy.

There, the defendant undertaker had let out his flower wagon and driver to another undertaker in charge of a funeral, for the regular price charged by and between undertakers in the community. The driver had been in the employ of the defendant for some years at a fixed salary and was familiar with his duties. It was unnecessary for the borrowing undertaker to instruct him other than as to the route and time schedule of the particular funeral procession. The borrowing undertaker could have "fired him and the truck off the job" for incompetence, etc., but could not have discharged him from his general employment by defendant, or substituted another driver in his

---

*These holdings, at least that in the Coul case, seem to go further than the leading case of Standard Oil Co. v. Anderson, 212 U. S. 215, 225, 53 L. Ed. 480, 29 Sup. Ct. 254, where it is said the power of substitution does not ultimately establish that the service is independent. But, this being a certiorari proceeding addressed only to the question of conflict between respondents' opinion and our decisions, we are not called upon to inquire whether the Coul, Rutherford and Skidmore cases are correct if and insofar as they conflict with the United States Supreme Court decisions. A determination of that question would require a survey of the whole range of supposed exceptions to the general rule, and probably would not affect the merits of the case under review.

place. The driver negligently permitted the flower wagon to collide with the plaintiff's automobile. The question before this court (Division I) on appeal was whether the borrowing undertaker *or* the defendant undertaker was liable on the doctrine of *respondeat superior.* The decision held as a matter of law that the general employer, the defendant undertaker, was liable and the borrowing undertaker was not; and a judgment against the former was affirmed, the opinion quoting the following from other decisions and from texts:

" 'While it is true that one may be in the general service of another, and, neverthelessless, with respect to particular work, may be the servant of another, who may become liable for his acts, yet to escape liability the original master must surrender *full control* of the servant in the performance of said work. *The fact that the servant is partially under the control of the third person* will not release the original master for any wrongful act done by the servant in the ordinary course of his employment. . . .' The question of who is the master and therefore responsible for the negligent act of the servant is said to be determinable by who *at the time* has the right to control the acts of the servant causing the injury. . . . 'To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under control of a third person. . . .' 'It is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation.' " (Italics ours.)

We are forced to the conclusion that respondents' opinion contravenes the O'Brien case. The opinion concedes the contract between relator Chapman and the general employer, Bradley, was verbal and meager. It deduces the essential terms thereof from what the parties did by way of performance. As regards Bradley's control over Buckley, it accepts as *facts* that Bradley worked on the job and selected his own employees; that he substituted Buckley for himself in driving the truck which figured in the collision; that he thereafter assumed charge of Buckley in repairing the punctured tire. Touching Chapman's authority over Buckley, the opinion sums up the evidence by saying. "While there is no evidence that the defendant (Chapman) gave Bradley or Buckley any directions during the day of the hauling, there is evidence tending to show that defendant was controlling, *in a material measure,* the operations of the haulers, including Bradley and Buckley . . ." (Italics ours.)

Under the O'Brien case this was not enough—for it shows Bradley had not surrendered complete control over Buckley, and that Chapman merely exercised control over him to a material extent, in other words, partially. We tentatively grant this latter evidence might have supported an inference that Chapman was in exclusive control if there

had been no evidence to the contrary. But the opinion concedes as a fact that Buckley did exercise some control. And we understand the O'Brien case to hold that unless the general employer surrenders full control of the servant he alone is liable for the latter's negligence— with one mentioned exception which we note in the three paragraphs following.

It cannot be said there is no conflict between respondents' opinion and the O'Brien case because the latter is silent as to whether the special employer (Chapman, here) may be liable if he exercises material control over the servant; and merely holds the general employer (Bradley) cannot escape liability unless he surrenders complete control. Respondents' opinion is not written on that theory— viz., the theory that both employers may be liable if both exercise control. The third paragraph thereof (137 S. W. (2d) l. c. 484) states the contentions of the parties: that plaintiff asserted Bradley and Buckley were relator Chapman's servants at the time of the collision; and Chapman defended on the ground that they were not his servants because the relation of independent contractor existed between him and Bradley. In short, the dispute was whether Buckley was Chapman's servant or the servant of Bradley, an independent contractor— to which one did he owe undivided allegiance? No question of joint or several control was raised or discussed in the opinion or in the briefs there.

The situation was the same in the O'Brien case. The court expressly said (334 Mo. l. c. 1241, 70 S. W. (2d) l. c. 1088) "We are not asked to hold that he (the driver there) was the servant of both." But in ruling the general employer alone was liable the O'Brien case cited several so-called "driver and team" cases, and quoted from one of them, Standard Oil Co. v. Anderson, supra, 212 U. S. l. c. 222, 53 L. Ed. 480, 29 Sup. Ct. 254, which declared the liveryman, not the hirer of the conveyance, is liable for the negligence of the driver thereof, unless the hirer (in this case Chapman) has exclusive control over the driver, or "unless he specifically directs or brings about the negligent act." (Parenthesis ours.) In the latter event, apparently, both the liveryman and the hirer would be liable. This is the exception we referred to in the second preceding paragraph. But there is no evidence that Chapman specifically directed or brought about the negligent act which caused the collision in the case under review; on the contrary, he was not present at the time. And, as already stated, the conceded facts show he did not have exclusive control over Buckley.

In this connection a later decision should be noticed. [Kourik v. English, 340 Mo. 370, 376-7, 100 S. W. (2d) 901, 905(3).] This, also was a pure master and servant vel independent contractor case. Nevertheless, it refers arguendo to the O'Brien case as bearing on the issue of joint or several control, thus: "Such an individual may even

be the servant of two masters at the same time so as to impose liability upon both for a single act. See cases cited in O'Brien v. Rindskopf, supra; American Law Institute, Restatement, Agency, secs. 226, 227." We are unable to find in the decisions cited by the O'Brien case anything dealing with the liability of two masters for an act of the same servant, save the few lines quoted, supra, from the Standard Oil Co. case decided by the United States Supreme Court. In Sections 226, 227 of the Restatement of Agency, a number of illustrations are given where it is said two masters may be liable for an act of the same servant. We do not discuss them because they are not involved here; also because it is evident the Kourik case does not mean to underwrite them by its mere reference to the sections, especially since this was done *arguendo* and the question was not presented for decision. For comments on such a straddling method of solving these vexing questions see: Atwood v. C., R. I. & P. Ry., 72 Fed. 447, 455; Smith on Scope of the Business, the Borrowed Servant Problem, 38 Mich. Law Review, 1222, 1235.

For the reasons given, the record of the respondent judges of the Kansas City Court of Appeals is ordered quashed. All concur.