STEPHEN D. PORTER, Respondent, v. THE WITHERS ESTATE COMPANY, Appellant.

Kansas City Court of Appeals, January 27, 1919.

1. NEGLIGENCE: Independent Contractor: Evidence. Plaintiff was injured by the giving away of a defective stepladder constituting a part of a scaffold being used by him while painting in a building owned by defendant. Plaintiff was working under one Batty, and on the question as to whether the latter was an independent contractor of defendant or its foreman, it was *held* that the contract, between Batty and defendant under which the former worked, headed "Painting Contract," and providing that it was agreed

Porter v. The Withers Estate Co.

that Batty was to do all the painting, both inside and outside, on the properties either owned or managed "by the defendant's agent" in Kansas City, Missouri, as ordered by "said agent," during the spring and summer of the year 1917 on the following basis, "defendant's agent to pay the actual cost of all painting materials used in the work," Batty to be paid fifty cents per hour for all time actually put in by him on the work and the actual cost of all additional labor employed by him, Batty to furnish at his own expense all brushes, ladders, scaffolding, drop cloths and equipment necessary to safely and economically carry on the work, is ambiguous as to whether Batty was a foreman or an independent contractor. This because it was not made certain in the contract whether on the one hand defendant, through it agent, had a right to order Batty not only as to what jobs that were to be done but in reference to the details and method of accomplishing the work, and, on the other, whether Batty was to do the various jobs of work as ordered by the agent in accordance with his (Batty's) methods, defendant to have control only of the result of the work. On account of this ambiguity in the contract it was *held* that the acts of the parties to the contract, showing their construction of it in carrying out the provisions, should be taken into consideration in determining what was the intention of the parties. Under the facts of this case it was *held* that it was for the jury to say what was meant by the parties to the contract and the finding of the jury that Batty was a foreman and not an independent contractor is upheld.

2. ———: ———: ———. While the mode of payment and the question as to who is to furnish the materials under a contract for painting is not a decisive test by which to determine as to whether the party employed is an independent contractor or an employee, these matters may be taken into consideration with other facts and circumstances throwing light on the question, including the matter as to whether the proprietor has control over the person employed.

3. ———: ———: ———. Where one engaged an independent contractor to do work and to employ others to assist in doing such work and the relation of independent contractor is established, if the parties thereafter abandon the contract and the person so engaged continues to employ persons and to work with them, exercising the authority of a foreman, the jury may find that such person exercising such authority had become the servant or foreman of the employer and that the relation of independent contractor has ceased.

Appeal from Jackson Circuit.—*Hon. Daniel E. Bird,* Judge.

AFFIRMED.

*Warner, Dean McLeod & Langworthy* and *Roy B. Thompson* for appellant.

*Brewster, Kelley, Brewster & Buchholz* for respondent.

BLAND, J.—Plaintiff recovered a verdict and judgment in the sum of $3,000 for personal injuries sus-tained by him on June 3, 1917, as the result of the negligence of the defendant in whose employ he was at the time of his injury.

Defendant's first point is that its demurrer to the evidence should have been sustained. In this con-nection it urges that one Batty, whom plaintiff claims to have been his foreman, was an independent con-tractor, and that plaintiff was the servant of Batty and not of the defendant. The facts in connection with this subject show that the defendant was the owner of a considerable amount of improved real estate in Kansas City, Missouri, owned by the late Webster Withers. Upon his death defendant company was organized and nearly all of its stock at the time of the trial was owned by his widow. Mr. W. W. Goodwin married one of Mrs. Withers' daughters and was the agent of the defendant. He looked after the renting of property the collection of rent, and repairs to be made.

Plaintiff, hearing that the defendant desired the services of a painter, met Batty on March 17, 1917, at Southwest Boulevard and 19th Street, and Batty told him that "he had—The Withers Estate had a lot of work to do and they wanted to get a man to help." Plaintiff asked Batty "what they were paying" and Batty replied, forty cents an hour. Batty told him that the work was not piece work but day work and to re-port at 1120 Walnut Street, a building owned by the defendant. On the 19th day of March plaintiff re-ported as directed by Batty and found Mr. Goodwin, who, having known plaintiff for sometime, greeted him

by his first name. Plaintiff asked Mr. Goodwin for whom was plaintiff working, and Mr. Goodwin replied, "You are working for us; The Withers Estate." Plaintiff said to him, "Batty tells me that you are only paying forty cents." Mr. Goodwin replied, "Yes, that is all I am paying. I can get plenty of men for forty cents." Plaintiff said to Mr. Goodwin that he thought he ought to have more but Mr. Goodwin replied that he could not pay more. Mr. Goodwin further said to plaintiff, "Mr. Batty is your foreman; go ahead; he will instruct you what to do." These conversations in the form testified to by plaintiff were denied by Batty and Goodwin. Plaintiff worked under Batty for five weeks at 1120 Walnut Street and thereafter about eight days at Mr. Goodwin's residence; one week at the residence of Dr. Chambers; thereafter at 31st and Paseo; at the Westover Building, owned by defendant; at 3236 Main Street, a residence owned by one of defendant's attorneys; the Withers Building at 31st and Troost, owned by the defendant; and, finally, at the Westover Building, owned by defendant, where he was injured on June 3rd. So he was injured not quite three months after the conversation had between Batty and plaintiff and between Mr. Goodwin and plaintiff, when the latter went to work. During all of this time plaintiff was working under Batty and the latter told him what to do.

At the trial defendant introduced a contract, dated March 6, 1917, or thirteen days before plaintiff first went to work, executed between defendant and Batty. It is headed "Painting Contract" and recites that it is agreed that Batty "shall do all painting, both inside and outside, on the properties either owned or managed" by Goodwin, in Kansas City, Missouri, as ordered by Goodwin, "during the spring and summer of the year 1917 on the following basis." Goodwin to pay the actual cost of all painting materials used in the work. Batty to be paid fifty cents per hour for all time actually put in by him on the work and the actual cost of all additional labor employed by him. Batty to

furnish at his own expense all brushes, ladders, scaffolding, drop cloths and equipment necessary to safely and economically carry on the work.

It is defendant's contention if there was any verbal contract at all between plaintiff and Batty and plaintiff and Goodwin wherein defendant and not Batty employed plaintiff, that that employment was merely for the first job done, or for work in the building at 1120 Walnut Street. This because plaintiff, between the time of the Walnut Street work and the job where he was injured, did a great deal of other work under Batty on other buildings, some of which were not owned by the defendant, showing a change in plaintiff's employment. Consequently, defendant says that the work plaintiff was doing at the time he was injured was being done as an employee of Batty and not of defendant. There is no evidence of any other employment except the oral one with Batty and Goodwin claimed by plaintiff and the painting contract claimed by defendant as engaging Batty as an independent contractor. Plaintiff does not admit that the "painting contract" was executed. We take it that defendant's contention is that the work being done at the time plaintiff was injured was being done under the written painting contract that defendant had with Batty. We prefer not to go into the matter as to whether the jury was required to believe that the painting contract was in fact executed, or, believing that it was so executed, that plaintiff was not working under the same at the time he was injured, but rather under his verbal contract with Batty and Goodwin. But, for the purpose of this case, we will assume that the work being carried on at the time plaintiff was injured was under the painting contract that Batty had with defendant, unless said contract was abandoned.

The painting contract upon its face suggests that Batty was merely to be the employee of Goodwin, defendant's agent. It does not engage Batty by the job but by the hour at a stipulated sum. Goodwin was also required to furnish or pay for all the materials. The

men to be hired by Batty were to be paid what their services actually cost Batty. In other words, Batty was to be reimbursed by defendant for the money he should pay out for hire. While the mode of payment and the question as to who is to furnish the materials is not a decisive test by which to determine as to whether the party employed is an independent contractor or an employee, these matters may be taken into consideration with other facts and circumstances throwing light on the question, especially in connection with the matter as to whether the proprietor has control over the person employed. [1 Thompson on Neg., sec. 629, p. 578; Shearman and Redfield on Negligence (6 Ed.), sec. 165, p. 400; 1 Labatt's Master and Servant, sec. 66, p. 233; 16 Amer. and Eng. Ency. of Law (2 Ed.), pps. 189, 190.]

We think that the painting contract on its face by no means is to be construed as meaning that defendant's agent, Goodwin, was not to have control over the method and details of the accomplishing of the work or that Batty was not to be under the immediate supervision and control of Goodwin. The work was to be done "as ordered by" Goodwin. Whether this means, as defendant assumes, that Batty was to do the various jobs of work as ordered by Goodwin in accordance with his (Batty's) methods, defendant to have control only of the result of the work, or whether Goodwin was to have the right to order Batty, not only as to what jobs to be done but in reference to the details and method of the accomplishing of the work, is not clear. However a reading of the contract suggests that Batty could not well refuse to obey Goodwin's directions as to the mode in which the work should be done. But we will assume that the contract is ambiguous on this point, so we must resort to the construction put upon it by the conduct of the parties subsequent to its execution. [Sedalia Brewing Co. v. Sedalia Water Works Co., 34 Mo. App. 49.]

We think there is no question but that the subsequent conduct of Goodwin and Batty was such as to show that defendant was directing and controlling the

manner of the execution of the work. In this connection the facts show that at the time the written painting contract was entered into Goodwin told Batty that instead of allowing forty cents an hour for the men as provided in the contract he would allow forty-five cents an hour; that if he, Batty, could get any *good men* for less than forty-five cents an hour, Goodwin, nevertheless, was to pay him forty-five cents, and that if Batty had to pay more than forty-five cents an hour later, that the defendant would reimburse Batty to the actual amount paid out by him. Goodwin testified that he was willing to pay Batty forty-five cents an hour for the men that Batty should hire even though Batty obtained such men for forty cents an hour; that the men so hired must be *satisfactory to Goodwin*. Plaintiff was hired at forty cents an hour. Plaintiff testified that Goodwin was on the work at 1120 Walnut Street, and that "he would give directions what to do and what colors to use and where to paint," and that he would direct Batty with a suggestion "about how high up we were painting this border," and that he directed Batty what to do, "how to paint it, and so on." We thus see that defendant was interfering in the work to the extent of insisting upon the kind of men that should be employed and giving directions to Batty as to details. All of which, in connection with the other facts in the case, is inconsistent with the idea that defendant was looking only to the result of the work. Taking all the facts in evidence a different case is made than Jackson v. Butler, 249 Mo. 342; Salmon v. Kansas City, 241 Mo. 14, and like cases cited by defendant.

Plaintiff testified that the work done on Dr. Chambers' building was done for Batty and that Batty paid him. All the other work done between the time plaintiff was first employed and the time he was injured was either on defendant's property or for Goodwin and his friends, and there is a strong inference that the work done for Goodwin's friends was paid for by Goodwin and his agents, the inference being that Goodwin was reimbursed afterwards by the parties. We do

not think that because on all these jobs plaintiff was apparently working under Batty and for no one else, or the fact that on some of these occasions the defendant was connected only remotely with the transactions, changes the situation in any respect. If Batty was plaintiff's foreman, plaintiff would very naturally get his instructions from Batty. It is true that Batty paid plaintiff some of the time on defendant's work, but not on all of the work. Batty got the money at 1120 Walnut Street, Goodwin's headquarters. The fact that Batty manually paid plaintiff is not conclusive that Batty was paying plaintiff with the former's own money. Of course, the money with which Batty paid plaintiff was obtained from defendant and even if it were paid Batty under the painting contract, it would not help defendant any for, as we have already said, that contract, as construed by the parties to it, was one for hire and did not create the relation of independent contractor between Batty and defendant but rather made Batty defendant's agent to hire men for defendant.

In addition to all of this, the evidence was such that the jury might find that the written contract was entirely abandoned between the parties before the time plaintiff was injured. It was not only altered verbally in the respect we have stated, that is, the amount that Batty was to receive for the men employed by him was changed from the actual amount of the hire to forty-five cents an hour regardless of whether the men cost Batty that much, but it was ignored in other respects. The contract provides that Batty was "to do *all* the painting, both inside and outside, of the properties either owned or managed," by Goodwin. (Italics ours.) Batty admitted that he was not given all of the painting provided for in this contract. On the first job that was done, that at 1120 Walnut Street, Batty did not furnish the scaffolding but was given lumber by Goodwin to use for scaffolding on that job. Most of the scaffolding used where plaintiff was injured was defendant's. One of the ladders belonged to the defendant. The plank

used in the scaffolding on which the painters stood belonged to the defendant. However, Batty furnished "a piece" of one stepladder. The ladder that broke, causing plaintiff to fall, belonged to one of the tenants in the building and was borrowed by Batty. If the painting contract was abandoned, then, or course, the inference is that Batty and plaintiff were defendant's servants.

At the time of plaintiff's injury he and Batty were doing interior painting in one of defendant's buildings located at 31st and Troost Avenue, in Kansas City, Missouri. In order to paint the side walls of the rooms in the building two ten foot stepladders were procured and a board two inches thick, ten inches wide, and twelve feet long was placed upon them to serve as a scaffold. At the time of the accident the scaffolding was placed for painting the west wall. Plaintiff at the time of his injury had just gotten upon the board that was resting upon the ladders to begin painting the "second stretch" and was reaching upward to begin painting the west wall when the north ladder broke precipitating him to the floor to his injury.

It is defendant's contention that the ladder was not broken until after it fell. We are unable to agree with this contention. While there was evidence that the board fell upon the ladder where it was broken and a cracking noise was heard after the scaffolding started to fall, ther is no evidence that plaintiff did anything to cause the scaffold to fall or that he lost his balance, or that the scaffold or ladders were unbalanced in any particular. There is nothing contrary to physical laws in the contention that the ladder broke causing the fall. Aside from these facts, the ladder was shown to have been defective where it broke. These ladders were ten foot ladders, that is, ten feet in height, with steps a foot apart. The steps were fitted in grooves on the inside of the side pieces or legs. These grooves were three-sixteenths of an inch wide. A leg of one of the ladders broke at the groove where the first, or lowest, step was attached. The evidence on the part of witnesses

who examined the ladder after the accident shows that the piece below the lowest step was broken entirely off. This piece was six to ten inches in length and had five old rusty nail holes in it, none of which had nails in them. Two nails remained in the end of the step that evdently had pulled through the outside piece. The evidence was that a good ladder has two nails to hold the step. One witness who examined the ladder after the accident was asked, "tell the jury what was the condition of that piece where it fits in there," and the witness said, "Well, it was—it looked like it was honeycombed and had three or four nail holes in it and had two nails sticking into the step." We take this testimony to mean that on account of the numerous nail holes in it the piece that broke off looked like it was honeycombed. As we have stated, there were five of these nail holes. The evidence was that the wood was not rotten but that the break was a "clean break." Defendant insists that there was no evidence of anything being wrong with the ladder and that if the wood was rotten it was rotten on the inside and would not appear on inspection. We do not construe plaintiff's evidence to mean that the wood was rotten but that it was in a weakened condition on account of having so many nail holes in it. The allegation in the petition in reference to the defect in the ladder was that "one of the legs of said stepladder was insufficiently strong for the purpose for which it was intended and was weak, insecure, insufficient and defective." There is no direct allegation that the wood in the leg was rotten.

Plaintiff was a workman of seventeen years experience in the work he was doing and he testified that he looked at the ladder "a little bit" before going on the same and that it looked "fairly good," but he did not examine it closely. Batty, plaintiff's foreman, examined the ladder, tested it, testified that it was in good condition, and assured plaintiff than it was all right. From this and like evidence defendant says there is no dispute in the evidence that the leg was not defective. We are unable to agree to this. Plaintiff's in-

spection was but superficial and the examination after the accident showed a defective leg. The jury was not required to believe defendant's foreman, or the testimony of the witness Taylor.

Defendant contends that the court erred in permitting plaintiff to testify as to his conversation with Goodwin at the time plaintiff went to work at 1120 Walnut Street. It is defendant's contention that plaintiff had already been employed by Batty and that the statement of Goodwin, two days later, was not a part of the res gestae. We think there is no merit in this contention. Plaintiff testified that he talked to Batty and that Batty stated "The Withers Estate had a lot of work to do and that they wanted to get a man to help." Plaintiff did not ask Batty what Batty was paying but what "they were paying" and before he went to work, not being satisfied with what Batty offered him in behalf of the defendant, evidently related to Goodwin his conversation with Batty and asked Goodwin to give him more. Also being desirous of knowing for whom he was working, asked Goodwin who it was. The jury could say that plaintiff did not make a contract with Batty but left the matter of closing the contract open until he saw Goodwin, for the reason that had he closed the contract he would not have attempted to get Goodwin to pay more than forty cents an hour, the amount mentioned by Batty, and the inference is that plaintiff did not go to work for Batty and had not agreed to the contract because he did not know whether the employment was between himself and Batty, and asked Goodwin if he was working for the defendant, desiring to work for the defendant and not Batty. We think the evidence was admissible, it was the agreement under which plaintiff went to work. Defendant says that what Goodwin said at the time was a statement of the latter's conclusion or opinion on the meaning of the contract made by Batty. We do not think there is any merit in this contention. Goodwin was the agent of the defendant, a corporation, for the purpose of keeping its properties in repair. When

plaintiff talked to him he had not made a complete contract of employment and Goodwin told him that he was working for the defendant; "that he was working for us, The Withers Estate," and upon being requested to pay more than forty cents an hour, stated that he could not pay any more. We fail to see why we must construe this evidence as a conclusion or opinion of Goodwin. Clearly it was a statement of fact, a statement of the conditions of employment. If it is defendant's contention that no contract is valid that contains a conclusion of the parties within the meaning of the rule of evidence that a witness testifying in court may not give a conclusion, then, of course, the point is ruled against defendant. Defendant urges in this court that the evidence was not admissible because it was of an alleged contract made long before the time of the accident; that it was in reference to the job at 1120 Walnut Street and that plaintiff was employed in the interim by Batty on work other than defendant's. The objection to this testimony in the trial court was that it was incompetent, irrelevant and immaterial because Goodwin was not authorized to make statements on behalf of the defendant; that it was a statement of the conclusion of Goodwin and was not a part of the *res gestae,* that is, not a part of the *res gestae* of the occurrence wherein plaintiff had a conversation with Batty at Southwest Boulevard and 19th Street. None of these objections go to the point now made.

The judgment is affirmed. All concur.