·Leslie Clyde Clayton, By Joseph H. Clayton, His Next Friend,· Appellant, v. Rufus Wells, Jr.

Leslie Clyde Clayton, By Joseph H. Clayton, His Next Friend, v. Hydraulic-Press Brick Company, Appellant, and Rufus Wells, Jr.—26 S. W. (2d) 969.

Division Two, April 7, 1930.

*Eliot, Blayney & Bedal* for appellant, Hydraulic-Press Brick Company.

*N. Murry Edwards* for respondent.

*Jones, Hocker, Sullivan & Angert* and *Robert L. Aronson* for respondent, Wells.

COOLEY, C.—This action was instituted in the Circuit Court of the City of St. Louis against two defendants, Hydraulic-Press Brick Company, a corporation, and Rufus Wells, Jr., to recover damages for personal injuries sustained by plaintiff, Leslie Clyde Clayton, who was seventeen years old when injured and sues by next friend. On trial the jury returned a verdict for defendant Wells, and for plaintiff against defendant brick company for

$20,000. The trial court required plaintiff to remit $4,000 of the verdict against the brick company and, upon that being done entered judgment for plaintiff against that defendant for $16,000, and against plaintiff in favor of defendant Wells. Plaintiff appealed from the judgment· against him in favor of Wells, which appeal is docketed here as case No. 28444. Defendant brick company appealed from the judgment against it and that appeal is case No. 28445 in this court. Although the two appeals were docketed here as separate cases, they were abstracted, briefed and argued together and will be disposed of in one opinion.

Defendant brick company was engaged in manufacturing brick and owned clay fields from which clay for its manufacturing purposes was procured. One of these was at Malcom, Missouri, and at that plant the brick company had a large shed in which it stored clay during the summer and fall for use during the winter season. It was in this clay shed that plaintiff, while driving a dump wagon loaded with clay, was injured. The shed was rectangular in shape, 250 to 300 feet square, the roof being supported by pillars so placed that they formed rows running north and south and east and west, twenty feet apart each way, throughout the shed. There were cross-beams resting on the tops of each row of pillars running east and west, above and near which cross-beams was the roof. The height of the pillars from the normal floor of the shed to the cross-beams was about thirty feet. The shed was inclosed on all sides, but there were certain openings in the walls. One of these was on the west side near the southwest corner of the shed, another being on the west side near the northwest corner. These two openings were each about seven to eight feet in height and about twenty to twenty-five feet wide. There was a railroad track for use in removing the stored clay, which track ran north and south through the extreme east part of the shed, and there were openings in the north and south walls to permit operation of engine and cars on said track. There was evidence by defendant that there were four "window openings" on the east side. No light could penetrate through the roof, and there was no artificial light in the shed. Plaintiff's evidence also tended to show that smoke from the brick company's engine, which entered the shed daily, collected and hung about the roof and timbers of the shed, adding to the obscurity therein.

In filling the shed, clay was hauled into it in wagons called dump wagons, drawn by horses or mules, until the shed was filled as nearly to the top as possible. The driver of a dump wagon procured a load of clay in the clay field near the shed by driving beside a tractor-drawn machine which dug the clay and dropped it into the wagon as it moved along. The driver would then drive into the shed and dump the clay, the wagons being equipped with a dump-

lever operated by the driver from his seat on the wagon. At the time of plaintiff's injury, August 8, 1925, the shed had been partly filled, so that the surface of the clay over which he was driving when injured was near the cross-beams and above the tops of the openings above mentioned. At the time in question the course pursued by plaintiff and other drivers was to enter the shed with their loaded wagons through the openings at the southwest corner, drive east about 150 feet, then north to the north part of the shed, and then westward to the point where the clay was then being dumped, leaving the shed through the opening at the northwest corner. There was in the shed at all times an employee of the brick company called a dumper who directed the drivers where to dump their loads and who leveled the clay after a load had been dumped.

On the day in question plaintiff and the other drivers had been following the route above outlined until about eleven o'clock A. M., when plaintiff, after entering the shed with a load of clay, was directed by one Pollard, the brick company's superintendent who was in charge of the plant, to turn and drive north in the space between rows of pillars next west of the space in which he had previously been driving north; this, because workmen had been loading clay into cars on the track at the east of the shed and their excavations were approaching the space through which the wagons had been going north. Obeying Pollard's order, plaintiff turned north into the space indicated and while driving northward in that space was caught between the wagon and a cross-beam and severely injured. He thus described what happened:

"Well, I started north; I guess I had driven about a hundred or a hundred and fifty feet, and it was dark in there, I couldn't see very well. There had been smoke hanging around, it was hanging around in the top of the building and the bottom on the ground, and when I got a little further down it got a little rough; I couldn't see that it was rough, but I could tell by the way the wagon went that it was rough, and just as I started to go under a place the hames on the mules caught on one of the cross-beams, that run the wagon forward, and I didn't have time to jump or do anything, but I saw I couldn't sit straight up and go along, so I ducked and went along, and it caught me right in the back of the neck, right here (indicating) and drug me down, doubled me up, squashed me."

He further testified that he could see in the dim light only about as far as the mules' heads; could not see how close the clay was to the cross-beams and could not see ahead so as to tell whether the clay was level or in piles; could not see that there was a rise in the clay under the cross-beams that caught him, but could tell there was because the wagon "raised up and went down." The catching of the hames on the cross-beam did not stop the team; "just got caught and gave a jerk, and then let loose." He had

not previously found it necessary to "duck" or stoop over when passing under cross-beams; had always ridden on the seat of the wagon; the dump-lever could be operated only from that position. There was testimony corroborating plaintiff's testimony except as to the order given by Pollard.

Plaintiff's petition alleges that Wells was a contractor, and by contract and arrangement with his co-defendant was working with said co-defendant in hauling clay into the shed, and that plaintiff was an employee and servant of defendants, and was injured while working as a driver "in the line of his duties as a servant of defendants." The grounds of negligence specified were in substance: failure of defendants to furnish a reasonably safe place to work, in that the surface of the clay over which plaintiff had to drive was rough and uneven and there were piles of clay over which he had to drive, and the place was not sufficiently lighted, and the surface over which he had to drive was too close to the cross-beams; failure to furnish sufficient light for the work plaintiff was required to do; that defendants permitted the shed to become filled with smoke so that plaintiff could not see while driving therein; that defendants negligently ordered and directed plaintiff to drive while seated on the wagon through a space under the cross-beams where they knew or should have known it was not reasonably safe for him to do so; and that they failed to warn him of the danger to be incurred when they knew or should have known such danger.

Defendants answered separately, each with a general denial and plea of contributory negligence, the defendant brick company pleading further that plaintiff assumed the risk. Plaintiff replied, denying the affirmative defenses.

I. Upon the *voir dire* examination of the prospective jurors, it was admitted (out of hearing of the jurors) that defendant Wells carried liability insurance and that his defense was being conducted by the insurance company pursuant to his insurance policy. Plaintiff's counsel was then permitted to question the talesmen as to  whether they were interested in that insurance company. After they had been thus examined, counsel for the brick company asked leave to state to the jury or to put questions that would bring out the fact that the brick company carried no insurance, which request was denied. That action of the court is urged by appellant brick company as error. The question presented was decided adversely to appellant's contention by the St. Louis Court of Appeals in Malone v. Small, 291 S. W. 163, which decision was cited approvingly by Division One of this court in Smith v. Star Cab Co., 323 Mo. 441, 19 S. W. (2d) 467, 469, wherein it is said:

"The fact that the Star Cab Company carried no insurance is of no consequence. Plaintiff cannot be denied the right to qualify the members of the panel for this reason; and, if a defendant without insurance is prejudiced thereby, he is without remedy." Citing Malone v. Small, supra.

We cannot say from the record before us that appellant brick company was prejudiced by denial of the privilege requested. Plaintiff had the right to qualify the jurors as he did under the circumstances. This contention is denied.

II. Plaintiff was hired and paid by defendant Wells, and appellant brick company strongly insists that Wells was an independent contractor and that plaintiff was his servant and not the servant of the brick company, wherefore the court should have directed a verdict for the latter.

Prior to plaintiff's employment, Wells and the brick company had entered into a written contract, dated October 11, 1924, which provided: That Wells should furnish to the brick company in the spring of 1925, thirty teams and drivers suitable for clay hauling, which were to be used for hauling clay at such of the brick company's plants in and around St. Louis and St. Louis County as it might designate; Wells to have the privilege of furnishing additional teams and drivers up to the limit of the company's requirements for clay hauling, but such privilege not to limit the company's use of its own teams nor obligate it to require additional teams from Wells; that all teams furnished should be capable of performing a day's work in hauling clay and all drivers to be competent non-union men; that the company would pay Wells "for every load of clay which he may gather with his teams and deliver into second party's (brick company's) storage sheds at the following rates, etc., designating prices per load at different places, and providing that as the rates were based on the current rate of wages paid for common labor by the company the rates should be raised or lowered in proportion to increase or decrease of prevailing wage scale at the company's plants prior to beginning work in 1925; that if new fields were opened by the company "or different methods used," the rates were to be so adjusted that a team would have approximately the same earning power as the average rates fixed; "teams employed in day work shall be paid for at the rate of $8.50 for two mules and a driver, and $2.50 extra for each additional mule;" that payments due Wells should be made weekly, the company retaining ten per cent of amount due until termination of contract when balance was to be paid to Wells if he "shall have complied with the terms of this contract and shall have continuously provided the aforesaid agreed number of teams and drivers for clay hauling on all days on which

*second party* (brick company) has been able to gather clay'' (italics ours) ; that if Wells failed to provide the agreed number of teams and drivers for any two consecutive clay-working days the company might terminate the contract and retain the said ten per cent of sums theretofore earned as liquidated damages; that on days when there might be no clay hauling the company would endeavor to provide work for Wells's teams; that if the teams were employed in brick hauling payments would be made at the company's established rates; the contract to terminate October 1, 1925, or when the company's sheds were filled if prior to that date, or unless the sheds should not be filled by October 1, in which event it could be terminated any time after October 1 by the company at its option.

The foregoing is a full summary of the contract. It will be seen that it contains no provisions relative to the manner of gathering or storing the clay, nor is there any reference to *Wells's* gathering clay except in that part of the contract fixing his compensation on the basis per load of clay gathered with his teams and delivered into second party's storage sheds. Considering all of its provisions it appears to have been intended as a contract to furnish teams and drivers rather than one to gather and store clay. And in any event it makes no provision for the manner in which the clay is to be placed or stored in the sheds.

Defendant brick company owned the plant, including the clay field and shed, the switch track, the engine and cars used thereon, and all of the wagons, excavators, tractors machinery and equipment used in carrying on the work, and apparently some teams used for clay hauling. Defendant Wells owned only the teams furnished by him and perhaps their harness. The brick company's superintendent, Pollard, was at the plant all of the time. Plaintiff's evidence shows that Pollard exercised supervision and control of the plant. It also shows that Pollard at different times directed employees, including drivers furnished by Wells, telling them what to do, and they obeyed him. There was a field boss in charge of and who directed operations in the clay field and designated where clay should be dug. He was an employee of the brick company and under Pollard's control and direction. Sometimes Pollard himself gave orders to plaintiff as to where to get clay, where to drive, or to take the excavator and load up clay that had been spilled out of other wagons; ''get that out of the road, and things like that.'' The tractor and loading apparatus was operated by brick company employees under direction of its field boss. In the shed the dumper, an employee of the brick company and under Pollard's authority, directed the drivers where to dump the clay. It is apparent that the movements of the drivers inside the shed were directed solely by the brick company's agents. According to

Pollard's own testimony, offered by the brick company, he directed the field boss where to have the men get the clay and directed the dumper where to have it placed in the shed. He testified:

"Q. So you supervise the work of getting the clay out of the field, don't you? A. Yes, sir.

"Q. And you supervise where they shall take and put the clay into the clay shed, and then you supervise where they dump it, don't you? A. Sure."

He also supervised and directed the removal of clay in the shed. At the time of plaintiff's injury it was Pollard who ordered him to change his route and directed him what course to take.

It does not appear that Wells directed his drivers as to the manner of performing their work except that he cautioned them to look out for their safety. He instructed them to put the clay "where the Hydraulic folks wanted it," but to be sure the place was satisfactory from the standpoint of safety. "I told my men to disobey the orders of the Hydraulic-Press Brick Company men out there to this extent that if they thought there was any danger they should use their own judgment, whether it was the boss or anybody else, to take care of themselves first regardless of what anybody says."

The fact that Wells hired and paid plaintiff is not conclusive that Wells was an independent contractor and that plaintiff was his servant in the performance of the work he was doing when injured. In determining whether one is an independent contractor or an agent or servant, various circumstances may be considered, such as the independent nature of his business, the existence of a contract for the performance of a specific piece of work, the agreement to pay a fixed price for the work, the employment of assistants who are under his control, the furnishing of tools and materials, and his right to control the work while in progress except as to results. The right of control as to the mode of doing the work is generally held to be the principal consideration in determing the relationship. [See Baker v. Scott County Milling Company (Mo.), 20 S. W. (2d) 494, and authorities cited.]

"A servant, according to the great weight of authority, is a person who is subject to the control of his employer with respect to the manner in which the details of the work are to be performed." [Lawhon v. St. Joseph Veterinary Laboratories (Mo.), 252 S. W. 44, 48.]

Where the contract in question is indefinite or ambiguous as to reservation of the right to control the manner and details of the work, the interpretation put upon it by the parties themselves, as shown by their conduct thereunder, may be looked to in determining its meaning. If Wells and the brick company understood and acted

upon the contract as leaving the right to direct the method of doing the work in the brick company and the latter did in fact exercise such right it cannot now assert as against plaintiff that he was not its servant in the work he was doing under its direction. [Baker v. Scott County Milling Company, supra; Porter v. Withers Estate Company, 201 Mo. App. 27; Lawhon v. St. Joseph etc. Laboratories, supra.]

We think there was ample evidence to justify submission to the jury of the question of whether or not plaintiff occupied the relationship of servant to defendant brick company in the work he was doing when he was injured. [Cases above cited, this paragraph; also Diehl v. Green Fire Brick Co., 299 Mo. 641, 645; Simmons v. Murray, 234 S. W. 1009, and cases; Holloway v. Schield, 294 Mo. 512, 243 S. W. 163; Maher v. Donk Bros. Coal & Coke Co. (Mo.), 20 S. W. (2d) 888, and cases cited.]

III. Appellant brick company contends that under the evidence plaintiff was clearly guilty of contributory negligence and that the court should have directed a verdict for said appellant on that ground. The argument proceeds upon the theory that plaintiff was familiar with conditions in the shed, knew the location of the cross-beams, had warning from the movement of the wagon before he reached the place where he was injured that the ground was rough and uneven; that when the hames struck the cross-beam he had notice that it was too low for him to pass under, but made no effort to check the team; and that if it was so dark that he couldn't see ahead of his team it was negligence for him to "drive blindly down an untried aisle where to his knowledge the danger of the overhead stringers was present every twenty feet." The argument assumes much that is contrary to plaintiff's evidence and reasonable inferences to be drawn therefrom and overlooks the fact that said appellant's superintendent ordered him to drive down the "untried aisle." It was untried to plaintiff as he had not been driving through it theretofore. But it was Pollard's duty to know before giving that order that it was reasonably safe for plaintiff to obey it, riding on the seat of the wagon as he was accustomed to do, from which point alone he could operate the dump lever, and where Pollard must have expected he would continue to ride, absent a warning not to do so, which was not given. Plaintiff had a right to rely on Pollard's superior knowledge and to assume that the order would not have been given unless it was reasonably safe for him to obey it. [See Brann v. Hydraulic-Press Brick Company, 288 S. W. 941, and cases cited; Ingram v. Prairie Block Coal Co. (Mo.), 5 S. W. (2d) 413, 415, and cases cited.] Plaintiff had not been compelled to

stoop to avoid other cross-beams in that aisle before reaching the one against which he was caught. He did not know and could not see that clay had been piled immediately under the one which caught him so that there was less space there than beneath others under which he had passed. When the hames caught and jerked loose, according to his testimony, the wagon ran forward and he was caught and injured before he had time to stop the team or do anything to escape injury. We are clearly of the opinion that plaintiff was not shown to have been guilty of contributory negligence as a matter of law and that appellant's demurrer on that ground was properly overruled.

IV. Appellant brick company complains of certain instructions. Instructions No. 1 and No. 3 are assailed as being broader than the pleadings, therefore erroneous. These instructions are long and we shall not burden this opinion by setting them out. Instruction Number 1 authorized recovery against appellant brick company if the jury found that plaintiff was at the time of his injury working as a servant of said brick company and was injured by the negligent failure of said appellant to furnish him a reasonably safe place in which to work, setting out the facts necessary to be found on that theory. It is not pointed out and we are unable to see wherein it is broader than the allegations of the petition. Instruction No. 3 is predicated on the negligent giving of the order to plaintiff to drive where he did. It is contended that the instruction contains the element that appellant negligently directed and caused plaintiff to drive while seated on the dump wagon. That was the customary way of driving. The seat on the wagon was provided for the driver's use in driving and he had to be on the seat in order to operate the dump lever. Pollard, in giving the order, could have meant and been understood to mean nothing else than that plaintiff should drive in the customary way.

A further criticism of Instruction 3 is that it does not confine the jury in its finding to the negligence specified in the petition and shown by the evidence. Reading the instruction as a whole and in connection with Instruction 1, we are satisfied the jury was not given a roving commission nor left in doubt as to the necessity of finding the facts as shown by the evidence and as pleaded.

Complaint is also made by appellant brick company that instructions numbered 5 and 7 are in conflict. The only instructions numbered 5 and 7 that we find in the record were given at the request of this appellant and relate to different subjects. From its printed argument we assume Instruction 13 is meant instead of No. 7. Number 13 was given at the request of defendant Wells defining what facts, if found, would

constitute plaintiff a servant of the brick company. Appellant brick company's Instruction 5 tells the jury what facts, if found, would constitute Wells an independent contractor and plaintiff his servant. They are substantially counterparts of each other. If there is error in either it is in the brick company's own Instruction 5 and it cannot complain of conflict thus created.

Complaint is made of the court's refusal to give an instruction withdrawing from the consideration of the jury the allegations relative to the presence of smoke in the shed. If smoke was there, as plaintiff's evidence tended to show, that would affect the light and plaintiff's ability to see. That instruction was properly refused.

There are other criticisms of instructions given and refused, but none that we deem necessary to discuss in view of what we have said in Paragraphs II and III.

V. Appellant brick company's final contention is that the amount of the judgment is excessive. Plaintiff received a very severe and a permanent injury to his spine. The surgeon who treated him and later operated on him, Dr. Morse, described the injury as a compressional fracture of the third lumbar vertebra. A compressional fracture is described as one in which the body of the vertebra is "telescoped," leaving it in such condition that it will collapse from the weight of the body. Plaintiff was taken off the wagon unable to walk and suffering intensely. He was taken to a hospital where he remained eight months. He was first put in a Bradford frame which held him in a fixed position and he remained in that frame about three months. On November 7, three months after his injury, in order to prevent his becoming "humpbacked," Dr. Morse performed an operation which consisted of taking a piece of plaintiff's shin bone and grafting it into the spine. The operation was successful in that the spine healed so that plaintiff was saved from becoming humpbacked, but it necessarily left that part of the spine stiff, three of the vertebrae being ankylosed or grown together. The graft extended from the lower end of the first to the top of the third lumbar vertebra and about six or seven inches of the back has no flexibility. In the opinion of Dr. Morse, plaintiff's back, while it may get stronger, will never be normal or become as strong as it was and plaintiff will never be able to do labor that requires stooping, lifting or exertion to any extent. Other surgeons corroborated Dr. Morse as to the character and permanency of the injury.

After the operation plaintiff was again placed in a rigid frame or cast in which he remained ten or twelve weeks. When removed from that he had to wear a plaster cast about his body which he still wore when he left the hospital. Soon after going home a

corset brace was substituted for the plaster cast, and about three months later an elastic bandage was worn about his body. He was still compelled to wear the bandage at the time of the trial, April, 1927.

Plaintiff testified that he suffered greatly at the time and while in the hospital and still suffers pain from his back, has but little strength in his back, cannot stand long without pain, and becomes sick and dizzy when he attempts to exert himself; that at times he is restless and nervous and cannot sleep and has pain if he remains long in one position. Dr. Morse testified that the condition of plaintiff's back could cause him pain at the time of the trial and might cause dizziness and nervousness if he attempted to exert himself.

Prior to his injury plaintiff's health and physical condition had been good. He was shown to be a bright, intelligent lad, of good habits, but with only an eighth grade education. He had lived on a farm and had no training for other than manual labor. His earning power after reaching majority undoubtedly will have been impaired by his injury, in addition to the suffering he has endured and probably will endure consequent upon such an injury. Without reviewing the numerous decisions cited by industrious counsel on this point it is sufficient to say that we do not feel justified in interfering with the judgment on the ground that it is excessive.

VI. The foregoing disposes of the appeal of defendant brick company. It remains to consider plaintiff's appeal from the judgment in favor of defendant Wells.

The only error assigned by plaintiff on his appeal is the refusal of the court to give his requested Instruction F and the giving of instructions numbered 11 and 12 on behalf of defendant Wells. Said Instructions 11 and 12 are on the subject of contributory negligence and the complaint concerning them is that they are broader than justified by the pleading and evidence and submit hypotheses of contributory negligence not pleaded. They do not submit the issue of contributory negligence in the language in which it is pleaded in Wells's answer, but in substance and effect we think they present the issue pleaded and which defendant's evidence tended to prove.

Refused Instruction F authorized a finding for plaintiff against Wells if the jury found that at the time of his injury plaintiff was working as a servant of Wells and within the scope of his employment as such and that Wells negligently failed to provide him sufficient light to do the work required of him, and that his injury was caused by such failure of Wells to provide sufficient light. The absence of light was only one of the elements which combined to make the place where plaintiff was hurt unsafe for the work he was doing. By plaintiff's Instruction No. 2,

submitting the issues as to defendant Wells, the absence of sufficient light was included with other facts pleaded, upon the finding of which facts, including insufficient light, the jury was authorized to find that Wells had not furnished plaintiff a reasonably safe working place and to find, for plaintiff against Wells if it found Wells to have been negligent in that regard and that plaintiff was injured thereby. Under the pleadings and evidence we are inclined to think that this instruction sufficiently submitted the question of lack of light and that the court did not err in refusing to give Instruction F authorizing recovery on the sole ground of insufficient light.

But if we are wrong in that conclusion, we are of the opinion that plaintiff is in no position to complain for another reason. While in his petition plaintiff alleged generally that when injured he was the servant "of defendants," he requested and obtained instructions submitting his case as to each defendant separately, each on the theory that, at the time of his injury and in the work he was then doing, he was the servant of a particular defendant. Plaintiff's Instruction 1 contains a preliminary general paragraph telling the jury that "at the time plaintiff was injured it was the duty of a master to exercise ordinary care to furnish and provide the servant a reasonably safe place in which to do the work required of the servant by his master." It then proceeds to state that if the jury finds that at the time of his injury plaintiff was working as a servant of defendant brick company and within the scope of his employment as a servant of said company and that the place where he was required to work as a servant of such brick company was not reasonably safe, etc., hypothesizing the facts to be found precisely as though the brick company were the only defendant, then the finding should be for plaintiff against the brick company.

By Instruction 2, plaintiff submitted his case as to defendant Wells in the same way and in substantially the same language. In order to find against Wells the jury was required to find that at the time of his injury plaintiff was working as a servant of Wells and within the scope of his employment as Wells's servant and that the place where he was required to work as Wells's servant was not reasonably safe, etc.

By Instruction 13, given for Wells, but which plaintiff does not question and which in his brief on the brick company's appeal he says is a correct instruction, the jury is told in substance that if the brick company reserved the right to control and direct Wells in the performance of the work and did control and direct him and the drivers, and through its agents directed plaintiff where to drive his team and where to dump the clay, then "plaintiff, for the purpose of this case, was a servant of the defendant Hydraulic-Press Brick Company." Plaintiff, in fact, throughout the case insisted

that in the performance of the work he was doing when injured the relation of master and servant existed between the brick company and himself. In his brief in the brick company's appeal he takes the position that Wells was not an independent contractor, therefore not his master in the work he was doing when injured, but was "nothing more nor less than an employee of the Hydraulic working for them on a sort of commission or piece-work basis."

Under the instructions the jury had to find that plaintiff at the time of his injury was working as the servant of the brick company in order to find for plaintiff against the brick company. And they did so find. In effect this was necessarily a finding that plaintiff was not, at the time he was hurt, working as the servant of Wells. Plaintiff's case did not proceed and was not submitted on the theory that he was the servant of Wells and was injured by breach of a duty the brick company owed him as Wells's servant, nor *vice versa*. He sought recovery against each on the theory of breach of the duty a master owes to his own servant. The two defendants were not engaged in a joint enterprise such that at the time of his injury plaintiff sustained the relationship of servant to both *in the particular work he was then doing*. While in a general way he may be said to have been Wells's servant, the jury found that in that particular work he was the brick company's servant, therefore not the servant of Wells.

"The fact that an employee is the general servant of one employer does not, as a matter of law, prevent him from becoming the particular servant of another, who may become liable for his acts. And it is true as a general proposition that when one person lends his servant to another for a particular employment, the servant, for anything done in that particular employment, must be dealt with as the servant of the man to whom he is lent, although he remains the general servant of the person who lent him." [18 R. C. L. sec. 244, p. 784; Karguth v. Donk Bros. Coal & Coke Co., 299 Mo. 580, 598, 253 S. W. 367; Holloway v. Schield, supra, and cases cited.]

Under the pleadings and evidence and the instructions upon which the case was submitted, we think the verdict for plaintiff against the defendant brick company necessarily amounted to a finding of non-liability of defendant Wells, so that error, if any, in the instructions given and refused as to Wells would be immaterial.

The judgment as to both defendants is affirmed. *Davis* and *Henwood, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All of the judges concur.