ARTHUR KOURIK v. THOMAS J. ENGLISH ET AL., Defendants, THOMAS J. ENGLISH and THOMAS J. ENGLISH ADJUSTING COMPANY, Appellants.

ARTHUR KOURIK v. THOMAS J. ENGLISH ET AL., Defendants, FIDELITY-PHENIX FIRE INSURANCE COMPANY of New York, a Corporation, Appellant.—100 S. W. (2d) 901.

Division One, January 5, 1937.

*George A. Hodgman* for Fidelity-Phenix Fire Insurance Company.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for Thomas J. English and Thomas J. English Adjusting Company.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

HYDE, C.—This is an action for damages for personal injuries alleged to have been caused by the negligence of the individual defendant Thomas J. English, in driving an automobile in which plaintiff was riding. Plaintiff obtained a verdict against all three defendants for $15,000. All defendants have appealed from the judgment entered on this verdict.

The appeal of the Fidelity-Phenix Fire Insurance Company will be first considered. Appellant contends that its demurrer to the evidence should have been sustained for the reason that ''defendant English and his adjusting company occupied the legal status of independent contractors in their relations with the defendant fire insurance company.'' For the determination of this question we take

the facts stated in respondent's brief, which we find to be correct and more complete and comprehensive than appellant's statement:

"On January 1, 1933, the plaintiff was, and for twenty-three years had been, a police officer; and at that particular time was connected with the 'Automobile Squad' of the St. Louis Police Department, which dealt principally with the recovery of stolen automobiles. The 'Automobile Squad.' was in charge of Lieutenant Norris, and both plaintiff and Lieutenant Norris were well acquainted with Thomas J. English, one of the codefendants and appellants herein.

"Mr. English was in business in St. Louis as an adjuster of insurance losses. He practically owned, and he operated, a corporation known as the Thomas J. English Adjusting Company, another of the codefendants and appellants herein, through which he carried on the adjusting business—as he said, he was the company, and, *at all times herein discussed, Mr. English was, concededly, the president and was acting as the agent and servant of the adjusting corporation.*

"The appellant Fidelity-Phenix Fire Insurance Company of New York, a corporation, the remaining codefendant and appellant, was in the fire and theft insurance business, and, in 1932, had issued a policy of theft insurance through its general agents at St. Louis, Oscar R. Witte & Company, to Branch Rickey, covering an automobile. The insured automobile was stolen during the month of November, 1932, and was recovered near Mills Springs, Missouri, late in December, 1932. On December 31, 1932, the men who had stolen the automobile were in jail at Greenville, Missouri, to which place the stolen automobile, in a damaged condition, had been taken.

"At the time Rickey's automobile was stolen, both the 'Automobile Squad' of the St. Louis Police Department and Oscar R. Witte & Company were notified of that fact, and the latter *referred the loss to Mr. English and his adjusting company for adjustment* in behalf of the appellant Fidelity-Phenix Fire Insurance Company, as was within its discretion, and as was its custom and practice.

"After the stolen automobile had been taken to Greenville, Mr. English had occasion to go there for the dual purpose of inspecting the stolen automobile and returning to St. Louis the persons who had stolen it. On December 31, 1932, Mr. English arranged with Lieutenant Norris to take plaintiff and Officer Henry with him for the latter purpose. The St. Louis Police Department had no means of returning prisoners to St. Louis, and, in the absence of an agreement on the part of English to pay for bringing the prisoners back to St. Louis from Greenville, the police department would just let them go, and the cost of taking plaintiff and his brother officer, Henry, to Greenville and the cost of transporting the officers and the prisoners from Greenville to St. Louis were to be paid either by the owner of the stolen automobile or the insurance company which had insured it against theft.

"Mr. English's own business automobile, a coupe, was unable to carry him, the two officers and the three prisoners, so he used his wife's sedan in making this trip. In the early morning of January 1, 1933, Mr. English and the police officers began their trip to Greenville, with English driving, Officer Henry sitting in the right front seat and plaintiff sitting in the rear seat just back of Officer Henry, and they took with them leg irons for the prisoners, which Mr. English had secured from Lieutenant Norris the day before. They traveled without incident south on United States Highway 61 to Farmington, Missouri, and while passing through the latter town the accident out of which this action arose occurred. . . .

"There was no dispute in the evidence to the effect that, including Mr. English, *the English Adjusting Company had six employees*, two of them being girls and four being men; that *these men did adjusting and investigating* of automobile claims of all kinds, and personal injury and marine losses; that Mr. English and his adjusting company operated what he called an *'independent adjuster office,' which was a business of their own*, and occupied separate offices of their own; that they advertised as an adjusting agency *to provide loss service for any insurance company* that desired their services; that Mr. English considered the business of adjusting such losses as one that *required special skill and ability*; that there were only three or four such offices as his in the City of St. Louis; that he had served some eighty-seven different insurance companies in his business; and that *neither he nor his company were on any salary or retainer* by the appellant, Fidelity-Phenix Fire Insurance Company.

"There is no dispute in the evidence to the effect that, aside from the method of payment, there is no difference in the work performed by the appellants English and his adjusting company, and the methods and manners employed by them in making adjustments, and the work performed by, and the methods and manners employed by, the ordinary experienced adjuster who works for a single insurance company alone, upon a salary basis.

"There is, also, no dispute in the evidence to the effect that the Branch Rickey automobile loss was referred to Mr. English through Oscar Witte & Company, and that he reported on that case through that agency; that English and his adjusting company *did not receive any directions with reference to the handling of that particular loss* from either Oscar Witte & Company or the appellant Fidelity-Phenix Fire Insurance Company; that, some time after the loss was referred to him, Mr. English sent the appellant Fidelity-Phenix Fire Insurance Company a total theft form which gave them a synopsis of his findings up to the time the form was prepared, and later prepared a proof of loss upon a form which he had printed for his use; that the interest of the appellant Fidelity-Phenix Fire Insurance Company in English's trip to Greenville was to determine the condition of the

stolen car and arrange for its return, and that English and his adjusting company had no instructions from appellant Fidelity-Phenix Fire Insurance Company *with reference to the arrest, apprehension or prosecution* of the persons who had stolen the Branch Rickey automobile.

"There is, also, no dispute in the evidence to the effect that appellants English and his adjusting company *had no contract, oral or written*, but had instead a 'general understanding' with the appellant Fidelity-Phenix Fire Insurance Company, and that English and his company were *paid* by the appellant fire insurance company *for each particular claim or loss handled*, on a *per diem* basis with expenses including reimbursement for the amounts advanced by the adjusters for rewards paid to police officers in automobile theft cases, such payments to the adjusters being made after the completion of the loss adjustment; that when an automobile theft loss is reported to the adjusters they identify the automobile, check the damage to arrive at the amount of damage, and then take up the adjustment with the owner of the automobile, and that the adjusters write to the insurance company to notify it of the progress of the case from time to time.

"There is also no dispute in the evidence to the effect that, in so far as the appellant Fidelity-Phenix Fire Insurance Company is concerned, the appellants English and his adjusting company get most of their authority and orders in St. Louis from the appellant Fidelity-Phenix Fire Insurance Company's general agents, Oscar Witte & Company, rather than direct from the appellant fire insurance company; that, after the appellant adjusters get their orders and directions from Oscar Witte & Company, *if there is nothing unusual about the case*, it proceeds along, and *after the adjustment is completed the adjusters send the papers* to Oscar Witte & Company; that *the adjusters use their own judgment* with reference to paying rewards and what to do with a stolen car after it has been recovered, whether it shall be sold or how it shall be preserved; and with reference to such other usual matters which can be handled by anyone with a knowledge of the subject; that on such usual matters the adjusters need no instructions; that the adjusters usually determine whether to pay a reward, and ascertain the proper person to whom the reward should be paid, and that English had done this for the appellant Fidelity-Phenix Fire Insurance Company; that the only distinction between the usual and unusual with reference to the payment of a reward is that in one instance the adjuster would get express authority to pay it, if in doubt about it, whereas in the other instance the ad juster would assume he had the right to pay it and get reimbursement from the insurance company; that, *with reference to anything* else that might be *unusual* or off the beaten path, the insurance company *tells the adjusters what to do*, and the adjusters defer to the in-

surance company's judgment; that, if anything unusual occurs during the handling of an adjustment, the appellant insurance company sends directions to the appellants English and his adjusting company as to what it wants done and the appellant adjusters follow the insurance company's advices; that the appellant Fidelity-Phenix Fire Insurance Company reserved the right to give instructions and to tell Mr. English and his adjusting company what to do at all times, and that if such instructions were given the appellant adjusters would follow them, and that, when the appellant adjusters submitted their information to the appellant Fidelity-Phenix Fire Insurance Company, whether it be then in piecemeal or final form, the appellant Fidelity-Phenix Fire Insurance Company *reserved the right to approve or disapprove*, and reserved the right, at all times while the investigation is on, to tell the appellant adjusters what to do or not to do.'' (Our italics.)

As stated in respondent's brief, the question to be determined on appellants' demurrer is, as follows:

Was there evidence to make a jury issue as to ''whether the legal relationship, between the appellant fire insurance company and the appellant adjusters, was that of master and servant, as contended by respondent;'' or did it show that ''the relationship existing was, as a matter of law, that of principal and independent contractor?''

We think it is clear from the above facts, which are undisputed, that the relation between the Fidelity-Phenix Insurance Company and the English Adjusting Company was that of independent contractor. Even though the Fidelity-Phenix reserved the right to tell the English Company *what* to do or not to do, it *clearly* did not, under their arrangements, have the right to tell them *how* to do what they desired to have accomplished. ''The control of the work reserved in the employer which makes the employee a mere servant is a control, not only of the result of the work but also of the means and manner of the performance thereof.'' [14 R. C. L. 68, sec. 4.] ''The fact that the employer has control over the amount of work to be done or has reserved the power to make alterations in the plans will not necessarily have the effect of creating the relation of master and servant.'' [14 R. C. L. 70, sec. 7.] Plaintiff emphasizes the statement that the Fidelity-Phenix reserved the right to say what to do or not to do. Does not a client reserve that right when he employs an attorney? Does not also a patient, who employs a physician, reserve that right? It seems clear that the services contemplated here are similar, because the result that can be obtained must depend upon the situation disclosed by investigation.

The services of an individual may be transferred by his employer to another, so as to impose liability for his acts upon the person to whom he is temporarily transferred. [O'Brien v. Rindskopf, 334 Mo. 1233, 70 S. W. (2d) 1085.] Such an individual may even be the

servant of two masters at the same time so as to impose liability upon both for a single act. [See cases cited in O'Brien v. Rindskopf, supra; Am. Law. Inst. Agency, secs. 226-227.] In this case, the evidence neither shows a transfer, nor any direction or right of direction by Fidelity-Phenix (or even knowledge) as to the alleged negligent act. While it would seem to be a misconception of the relation of master and servant, there are cases which have said that such relation may exist between corporations. [Alabama Power Co. v. Bodine (Ala.), 105 So. 869, but see also Alabama Power Co. v. Key (Ala.), 140 So. 233; McWilliams v. Detroit Central Mills Co., 31 Mich. 274.] Both of these cases make a positive statement as to such a relation, without citation of authority, and they perhaps might have reached the same result on the theory that the corporation held liable violated a duty owed directly to the plaintiff therein. [See Lowery v. Kansas City, 337 Mo. 47, 85 S. W. (2d) 104, l. c. 110-111.] It is, of course, true that one corporation can be the agent of another (2 Am. Jur. 22, sec. 15; Am. Law Inst. Agency, 64, sec. 21).

But undoubtedly such an "agency contemplates contractual liability arising from the acts of the agent." While the cases have not always made clear distinctions, a servant is not, as such, primarily employed to establish contractual relations, although he may do so incidentally. [See 2 Am. Jur. 16, note 2, sec. 7.] A servant is usually employed to perform certain acts in a way that is or may be specified; he "deals with things; if he deals with persons it is not to bring about contractual relations." [2 Am. Jur. 16, sec. 7; Freeman v. Berberich, 332 Mo. 831, 60 S. W. (2d) 393, and authorities cited.] "A servant is a person employed to perform service for another in his affairs and who, *with respect to his physical conduct* in the performance of the service, is subject to the other's control or right to control." [Am. Law Inst. Agency, 483, sec. 220.] The rule, as to the principal's liability for physical harm done to persons or property *by an agent*, stated by the American Law Institute is that (except as to (a) performance of act which principal is under a duty to have performed with care, such as construction or hazardous activities, see Sec. 214; and (b) making of representations, Sec. 251), "a principal is not liable for physical harm caused by the negligent physical conduct of an agent, *who is not a servant*, during the performance of the principal's business, unless the act was done in the manner directed or authorized by the principal or the result was one intended or authorized by the principal." (Sec. 250).

The words "servant" and "agent" have often been used in decisions interchangeably, and an agent employed to make contracts might also, with respect to some of his duties, be a servant. [Am. Law Ins. Agency, 485, comment under sec. 220.] Perhaps one reason for this loose use of terms, is that Americans do not like the word "servant." It would seem that the terms "employer and employee"

make a better designation of the relation in this industrial age. [18 R. C. L. 490, sec. 1; 39 C. J. 34, sec. 1.] However, the term "independent contractor" has always been used to designate a clearly different agency relation from that of common law master and servant. [For tests and definitions, see Am. Law Inst. Agency, 483-485, sec. 220; 2 Am. Jur. 17, sec. 8; 2 C. J. S. 1027; 3 C. J. S. 188; 39 C. J. 1316; 19 A. L. R. 1168 note; 20 A. L. R. 684 note; 75 A. L. R. 725 note; Sargent v. Clements, 337 Mo. 1127, 88 S. W. (2d) 174; State ex rel. Superior Mineral Company v. Hostetter, 337 Mo. 718, 85 S. W. (2d) 743; Maltz v. Jackoway-Katz Cap Co., 336 Mo. 1000, 82 S. W. (2d) 909; Coul v. George B. Peck Dry Goods Co., 326 Mo. 870, 32 S. W. (2d) 758.] The only possible conclusion here is that the Fidelity-Phenix Insurance Company exercised no control and had no right to control the details of the physical movements, or to direct the activities or use of the time (for performing the work necessary to reach the desired result), of the English Adjusting Corporation or of any of its employees (either defendant English or any other); and that the relation between the Fidelity-Phenix Insurance Company and the other defendants was that of independent contractor. Therefore, the demurrer of this appellant should have been sustained.

█ On the appeal of Thomas J. English and the Thomas J. English Adjusting Company it is also contended that their demurrer to the evidence should have been sustained. Two grounds are urged. The first is that "there was no evidence to prove a causal connection between the alleged accident and the claimed injury." Appellants were not entitled to have a demurrer sustained on that ground because there was substantial evidence that appellant English was negligent in driving the car and that plaintiff sustained some injury because of such negligence. [Kimmie v. Terminal Railroad Assn., 334 Mo. 596, 66 S. W. (2d) 561.]

█ The second ground stated is that "there was a fatal variance between the pleadings and the proof." This same ground is urged against plaintiff's main instruction. Appellants say:

"The petition of plaintiff alleged that the plaintiff's injuries were received as the result of the carelessness and negligence of the defendant English in striking an elevated portion of the highway over and along which he was then traveling. Plaintiff's instruction No. 1 as given by the Court authorized the jury to find that 'Said automobile struck said *elevated* portion of said highway, which was elevated above the ordinary surface thereof.' All of the evidence with reference to the condition of the highway was that there was no appreciable elevation in the pavement at or near the point in question but that there might have been a very slight dip in the pavement on the south side of the railroad crossing and on the west side of the highway."

The evidence does show, that to the south of the railroad crossing there was a dip in the surface of the highway; that the low point

there was eight or ten inches below the highest point; and that the State Highway Department later placed a "dangerous dip" warning sign here. It is true that any elevation to the south of this dip was a gradual rise from the bottom of the dip, but plaintiff's petition did not state whether or not the elevation struck was abrupt or gradual. Any substantial elevation would be within the pleadings. If there was not some elevation of the pavement on each side of the dip, above the level of the bottom of the dip, there would be no dip. The jury could not have misunderstood the issues on this charge of negligence. We, therefore, hold that there is no merit in this contention. The demurrer of these appellants was correctly ruled, and there was no error in the submission of the negligence issues.

The other assignments made by these appellants go to the size of the verdict. They are that there was no evidence proving a permanent injury resulting from the alleged accident; that the verdict was grossly excessive; and that it was the result of bias, passion and prejudice. We think that this verdict is excessive even for the results of the injuries shown, because plaintiff was able to continue to perform the duties of his employment for almost two months after the accident; he was then only off duty sixty-five days without loss of earnings, so far as the record shows; and, although he may have a permanent limitation of the motion of his neck, some pain therefrom, and the discomfort of wearing a leather collar for support while working, he is not shown to have been incapacitated from continuing his employment or from earning as much as he ever did. If it was only a matter of excessive amount it could be cured by *remittitur*. However, we find that the evidence is insufficient to establish that the principal injury claimed was caused by the accident. If it was not caused by the accident then the verdict is far in excess of what the evidence justifies and must have been based either upon speculation and conjecture or bias and prejudice. It may be noted in this connection that plaintiff got before the jury the liability insurance of defendant English, so that it appeared to the jury that the verdict would in any event be paid by insurance companies.

Plaintiff's account as to how he was injured was, as follows:

"Q. When the auto struck the crossing there what happened to you? A. Well, the next thing I was knocked out. When I come to I was looking for my glasses, and when I got straightened up my glasses was down in my lap. Q. Do you remember where you were with reference to that right seat, right side of the seat—were you still there, or had your body been moved over in any direction? A. No, I was moved to the left. Q. What part of your head or neck struck any object? A. Well, it was done so quick that I couldn't tell what hit. *All I knew, I hit the top of the roof.* Q. Roof of the car? A. The car jarred us and *I hit the roof, and that is all*, it was done so quick. Q. What did you hit the roof with, do you recall? A. *My head,*

. . . Q. And did he stop the auto? A. I thought he stopped. I was dazed, and I thought he had stopped the automobile. If he didn't stop, he was going awful slow. . . . Q. What did he say? A. He said, 'Do you want to go to a doctor,' and I said 'No.' . . . Q. Did you say anything more to him about it? A. No, I said, 'My neck hurts, I have got a pain in the head.' . . . Q. Did you say the car stopped, or just slowed down? A. Well, I was dazed, and I thought the car slowed down. I said stopped; it might have just slowed down. Q. Yes. And did you make any complaint to them at that time about being hurt anywhere? A. No, not at that time, no. Q. When was the first time you ever did make any complaint? A. When we got down to Greenville. . . . Q. Was your head cut anywhere? A. No, sir. Q. *Any bruises at all on your head?* A. *No, sir.*'' (Our italics.)

Policeman Henry, who was plaintiff's witness, testified as follows:

''In hitting the crossing the car bounced considerable. . . . Kourik, sitting in the back, he let a holler out of him, and I looked around like that (indicating), and he was laying right down in the seat, on his left side. . . . Kourik . . . made a remark about being hurt, or I believe his head hit the top of the car. . . . *He said his head hit the top* of the car. . . . After we got into Greenville . . . he complained of his head hurting him a little bit, or making headache.''

Defendant English testified: ''When I looked back he (Kourik) was getting up from the floor of the car between the front seat and rear seat and had his glasses hanging down on the edge of his nose. I asked him 'What is wrong with you?' and he said, '*My head hit* something.' I said, 'What did you hit? What did it hit, on your head?' and he said, 'Yes'.'' Defendant's doctor also testified that plaintiff told him that ''he had an injury on the first of January, 1933, when *his head hit the top* of an automobile.'' (Our italics.)

Plaintiff's own doctors testified to his injuries as follows:

''Dr. SANTE: That is the spinous process of the first, here is the second, here is where the third should be. . . . The third is broken off here (indicating), and the fragment that came from there is displaced down here in the neck (indicating). The portion that is taken off of the third vertebra is right here (indicating), and, if it were properly in its place, it would be attached to the back part of the third cervical vertebra, third vertebra of the neck. The picture simply shows here the place where the broken off portion came from (indicating) and here is the displacement of the fragment rather far down and backward in the soft tissues of the neck. . . . The spinous process is a projection of bone that extends out at the back of the vertebrae for the attachment of ligaments and muscles.''

Dr. LEVEY: ''I find a fracture of the spinous process of the third cervical vertebra, with the fractured portion displaced downward in-

to the soft tissues at the posterior part of the neck at the level of the sixth cervical vertebra.''

Dr. PERNOUD: ''It is my judgment that plaintiff had a fracture of the spine of the third cervical vertebra, with the broken-off fragment displaced downward. The force that had caused this break had caused a disturbance in the soft tissues around the edges of the joint, the muscles and tendons of the neck, particularly, in the back of the neck. As I saw it, there was an inflammatory disturbance involving practically all the structures of the back and sides of the neck. . . . A trauma sufficient to cause a spinous process of the third cervical vertebra to be broken and to be detached and displaced downward to the extent shown in the pictures would cause inflammation to be set up in and around the particular vertebra both above and below, and I found such inflammation in my examination.''

Dr. GUNDLACH: ''Aside from the foreign body which has lodged itself in this displaced manner, there are marginal changes to the softer structures and articular surfaces of the other vertebrae. The ligaments were torn loose. . . . I would judge that the fragment of bone is about an inch from the spinal column.''

Defendant's doctor, Dr. Key, testified as follows:

''There is a calcified mass about the size of the end of my little finger, I should say, which lies posterior to the spinous processes of the vertebrae at about level between the spinous processes of the fifth and sixth cervical vertebrae. This mass seems to be embedded in the ligamentum nuchae, which is a dense, hard mass of ligament which runs up the back of the neck and helps support the head. . . . I am not able to say that that ever was attached to any vertebra, for two reasons; one is because occasionally in taking routine X-rays of the neck we find a calcified area such as this in this location in individuals who have never had any injury. The other reason is that this man's symptoms are not, in any way that I could determine, localized in relation to this loose, calcified mass in this ligamentum. . . . I don't think it could possibly have been pulled off of the third. It would have to travel about two inches, through dense tissue, and would have to travel downward. It is inconceivable that the dense tissue which is attached to the spinous processes, should retract a distance of two inches through dense tissue, you see. . . . It is so far away, it is my opinion that it is just a calcified mass in the ligament and it can't have been pulled off of anything. It is rather uncommon, but it is not unknown. . . . That is not the first one I have seen. . . . The third is normally a short spinous process, just as the first is. The second is the big one, and the other big one is the seventh. . . . The third is normally short. . . . I can't see anything there where anything has been pulled off there.''

Defendant's Dr. Ernst testified that in his opinion the foreign body could not have come from the third cervical vertebrae; that he could

not say with any certainty from his X-ray examination that it came from any vertebrae, but that he felt that it probably came off the fifth or sixth. He said that if it did "it is not an injury to the spine, because the injury is outside of the spine itself, it is the soft parts in the neck." All of the doctors found evidence of some arthritis about the fifth or sixth vertebrae, which they said was not uncommon in a man of plaintiff's age, fifty years old.

It thus appears that the condition, which plaintiff's medical testimony tended to show existed, could only have resulted from the application of great force to the back of plaintiff's neck; but that plaintiff positively testified that his head hit the roof of the car. That is all that any other testimony shows. According to plaintiff, his head did not hit the roof with sufficient force to make even a bruise. There is nothing to show the composition of the car roof. There is no evidence to show that the back of plaintiff's neck came in contact with anything or that any force was applied to it. Defendant's medical testimony tends to show that it was not possible at all for a piece of the spinous process to be broken off of the third cervical vertebra and forced downward through dense muscular tissue to the point where a foreign substance was found. Plaintiff had no medical testimony that this was possible from anything that plaintiff said happened to him; and plaintiff had the burden of proof to show that this did occur as a result of the negligence alleged. Plaintiff's medical testimony did tend to show that a part of the spinous process of his third cervical vertebra was broken off; but he had no evidence tending to show that any force was applied to it in the alleged accident which could have broken it off; or that, if force sufficient to break it off had been applied from being thrown against the top of this car, it could have forced it two inches through the tissue in which it was found; or that this was what did result from the operation of the car by defendant English. Plaintiff, therefore, failed to produce substantial evidence to connect the injury with the negligence. [Kimmie v. Terminal Railroad Assn., 334 Mo. 506, 66 S. W. (2d) 561; Bieser v. Goran, 340 Mo. 354, 100 S. W. (2d) 897.]

This verdict cannot stand, because it is too large to be justified upon any ground except that a part of the spinous process of plaintiff's third cervical vertebra was broken off and displaced downward about two inches as the result of force applied to it at the time the automobile went over the dip in the pavement at the railroad crossing. Since the question of whether or not anything which happened on that occasion did produce that result cannot be determined from the evidence in this case, it cannot be cured by *remittitur*. [Kimmie v. Terminal Railroad Assn., supra.] Since there is substantial evidence to show that plaintiff is entitled to recover for whatever injuries he did receive on that occasion, and since it appears from this record that

he may be able to produce more definite evidence as to what did happen, he should be given the opportunity to do so at another trial.

The judgment is reversed as to defendant Fidelity-Phenix Fire Insurance Company, and reversed and remanded as to defendants Thomas J. English and Thomas J. English Adjusting Company. *Ferguson* and *Bradley, CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur, except *Hays, J.*, who concurs in result only.