**James S. SCOTT Respondent,**

v.

**FORD MOTOR CREDIT CORP., Appellant.**

**No. WD 37163.**

Missouri Court of Appeals,
Western District.

Dec. 31, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied March 4, 1986.

Application to Transfer Denied April 15, 1986.

James W. Humphrey, Kansas City, for appellant.

Gary W. Collins, Kansas City, for respondent.

Before NUGENT, P.J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a civil action seeking actual and punitive damages for trespass, wrongful taking, and conversion of a motor vehicle. Judgment for actual damages in the sum of $5,000.00 and for punitive damages in the sum of $75,000.00 was entered. The judgment is reversed.

Appellant, Ford Motor Credit Corporation, (hereinafter Ford) presents a sole point, which in summary charges that the trial court erred in overruling its motion for judgment N.O.V., because respondent James A. Scott (hereinafter Scott) failed by his evidence to establish that the Federal Recovery Bureau, Inc. (hereinafter Feder-

al), acted within the scope and course of its agency for Ford when it (Federal) intentionally entered onto Scott's property without lawful authority.

The pertinent facts are as follows: Scott purchased a 1983 Ford F-350 pickup truck from Merle Kelly Ford in Chanute, Kansas. The truck was new and consisted of only the cab and chassis. Scott later added a flat bed to the truck. There was evidence of Scott's complaint that the truck did not operate properly under load. The truck was returned to the dealer. A load was applied to the truck and other tests were conducted. The report of these tests was that the truck performed as intended by design. It appeared that Scott either thought or expected the truck to have what was called a 410 rear end with an automatic transmission. The evidence, however, established what Scott purchased was a 350 rear end. This evidence was introduced as background for events later disclosed in the evidence and not as a basis of any claim of fraud or misrepresentation by Scott. The evidence further revealed that Scott picked up the truck on March 21, 1983. The first payment was due in April, 1983. From April to September, Scott made three payments on the truck. The truck was repossessed by Federal on September 9, 1983. Some 17 days after the truck was repossessed, this action was filed.

In this appeal, Ford has suggested that Scott has failed by his evidence to make a submissible case on the question of the existence of an agency relationship between it (Ford) and the Federal Recovery Bureau, Inc.[1] Two things are noted: First, Ford, under its point relied upon, talks about course and scope of agency and then in the argument portion of its brief, it argues the lack or absence of an agency relationship between Ford and Federal. It is obvious to this court that Ford makes a direct challenge to the existence of any agency relationship, and this appeal is reviewed on that basis. Scott is correct in his brief to have pointed out this difference.

Secondly, Scott is also correct that review by this court must be as to only the facts and inferences therefrom which are favorable to him, and that this court must disregard all evidence to the contrary.

Procedurally, what occurred was that Ford presented its motion for directed verdict at the close of Scott's case upon the latter's failure to make a submissible case on agency. This motion also challenged Scott's evidence in support of his claim for punitive damages. The trial court overruled this motion. The motion was again made at the close of all the evidence and for judgment N.O.V., both of which were overruled.

This court is then required to determine from the whole of the evidence whether Scott made a submissible case establishing an agency relationship between Ford and Federal. Scott, in addition to his own testimony, produced the testimony of three witnesses. Scott's first witness was Don Swofford, Sheriff of Ray County. The Sheriff offered no testimony on the question of agency. The second witness for Scott was one Dale Bosley, a friend of Scott's who also provided no evidence on the question of agency. The third witness, Jerry Ferril, a friend and sometime employee of Scott, likewise offered no evidence upon the question of agency.

Scott then was called to testify. He testified to having trouble with the truck, that it was returned to the dealer, and that the tests later ran on it revealed the truck performed as designed and intended to operate. One apparent difference over the operation of the truck was Scott's claim of not being able to start the truck (with load) from a dead stop in second gear. Scott admitted that he was advised by a representative of the manufacturer that a dead stop (with load) start should be in first gear. Scott offered testimony on the financing of the truck as well as his contact with the Ford Consumer Appeal Board regarding his complaint of the operation of the truck. Scott testified that on the eve-

---

1. The Federal Recovery Bureau has never been a party to these proceedings.

ning of September 8, 1983, he had the truck on his premises, a business-residence. The truck was locked. The premises were surrounded by a chain-link fence and the gate was secured by a chain and padlock. Scott went outside (on his premises) about 6:10 a.m. on September 9, 1983, found the gate open and the truck missing. He notified the Sheriff that the truck was missing. He then found his gate chain and lock. The chain had been cut. At about 10:00 a.m., he was advised by the Sheriff that his truck had been repossessed. He testified that some three days later, he went to the Ford offices and picked up some of his personal belongings. In doing this, he signed a form receipt from Federal. He also stated that he had previous conversations with an employee of Ford regarding his payments and that upon his failure to pay, Ford would repossess. From the whole of Scott's testimony, it can be concluded that he supplied absolutely no evidence on the question of agency between Ford and Federal.

After his testimony, Scott sought and was permitted, over objection, to read certain interrogatories and portions of depositions. This is critical to the sole question on this appeal and necessitates direct reference to the transcript:

MR. COLLINS: At this time, Your Honor, we have got some admissions out of Interrogatories and depositions, that we want to read into the record. It will take us a little while.

THE COURT: How do you propose to do that?

MR. COLLINS: The deposition would be the only one of any length. The others are fairly short. I can just read them out of my copies. I propose—

MR. HUMPHREY: I have a record to make with regard to that, Your Honor.

THE COURT: Come up to make the record.

(Proceedings held at the bench.)

MR. HUMPHREY: I am sure that one of the things that counsel intends to read at this time is the Interrogatory to which I referred to in my motion in limne (sic), Defendant's Exhibit A, which has to do with the opening Interrogatories to which Federal Recovery Bureau, acting as an independent contractor, repossessed Plaintiff's truck.

We attempted to amend that Interrogatory. We renew our attempt at this time.

In further support of that motion, we hand to the Court that which has been marked Defendant's Exhibit H, which at the second to last paragraph advises counsel that I have learned that the vehicle was repossessed by an independent company which specializes in recovery. So Plaintiff's counsel have notice of the fact that Federal Recovery Bureau was an independent company, at least as early as October 12th, 1983.

The Interrogatory answer in itself does not admit agency in the answer. It is only the question which it asked, what was the agency that picked up the vehicle, to which we responded, "Federal Recovery Bureau, Inc.," which is not our agent, in that we are responsible for trespass or whatever they may have done. So we renew our application to amend that answer, and I object to counsel reading it in its present form to the jury.

MR. WRIGHT: Your Honor, along that line, to be read to the jury, but the witness who made that statement, who is here today, later, in his deposition, was asked if he answered those Interrogatories, and he said specifically that they were, and they were correct, and that Interrogatory was correct.

So there was several months there before his deposition was taken, and he is here today, and he answered the Interrogatory. The Interrogatory in question was correct, and that is a matter of documentation, too, that is in this court record.

MR. HUMPHREY: But you are trying to read in legal responsibility for his actions, and the rest of his deposition clearly establishes an independent contract relationship.

MR. McCALLEY: It seems to me it is a question for the jury, whether or not an agency existed, and his answers are his answers, and the jury can take into consideration—

THE COURT: They can give it whatever weight and credit—I am going to overrule your objection at this time.

MR. HUMPHREY: I just want to make one more remark, is that a complete reading of the deposition will show that they were not Ford Motor Credit Company's agent in the sense that we are responsible for its acts. To take an isolated question out of context is not a fair reading of the deposition.

So, if they intend to read admissions, I intend to read, at the time they read their admissions, explanatory statements putting the answers in context.

THE COURT: He has a right to do that. The interrogatories and deposition material referenced above were provided this court by a supplemental transcript. The pertinent portion of that supplemental transcript reads:

MR. COLLINS: I will read first question number one.

"Please state the name, address, and job title of the person responsible for answering these Interrogatories on behalf of the Defendant."

"Answer: Mark C. Mayo, 3902 Booth, Kansas City, Kansas, Customer Accounts Supervisor."

I will next read Interrogatory No. 2, "Did Defendant cause to be repossessed the Plaintiff's 1983 Ford F350 pickup truck? If so, state, A. Name and address of the Defendant's agent who performed such acts."

"Answer: Federal Recovery Bureau, Inc., Post Office Box 28022, Kansas City, Missouri, 64118."

MR. HUMPHREY: May my objection to this answer and question be continuing, so I don't have to stand up?

THE COURT: They may. Do you understand that?

MR. COLLINS: Yes.

"Question: Date of such repossession?"

"Answer: 1983."

"Question: Place of such repossession?"

"Answer: 4205 East Highway 10, Excelsior Springs, Missouri."

"Question: Name and address of all employees of Defendant's agent directly involved in each such repossession."

"Answer: Dave Ryan, Post Office Box 28022, Kansas City, Missouri, 64118, and Dave Mill, Post Office Box 28022, Kansas City, Missouri, 64118."

Interrogatory No. 6 on Page 2, "State the names, addresses and job title of all companies and/or individuals having possession of the 1983 pickup from the time of its repossession to the date of answering these Interrogatories."

"Answer: Federal Recovery Bureau, Inc., Post Office Box 28022, Kansas City, Missouri, 64118; Ford Credit, 440 West 190th Street, Overland Park, Kansas; Merle Kelly Ford, Inc., 3501 South 169 Highway, Chanute, Kansas, 66720."

That is all the admissions from those Interrogatories.

As to the pertinent deposition material, the supplemental transcript reads as follows:

"Question: Would you state your full name, please?" "Answer: Mark Creighton Mayo."

"Question: Mr. Mayo, I represent James A. Scott. I am one of the attorneys for Mr. Scott in the case that's filed in Ray County, James A. Scott versus Ford Motor Credit Company, and I am going to be asking you certain questions concerning Mr. Scott and other related matters. What is your position with Ford Motor Credit Company?" "Answer: I am the Credit Supervisor."

On Page 5, Line 15: "Question: You are the one, though, in charge of the repossessions?" "Answer: At that time, no."

"Question: Were you earlier?" "Answer: Yes."

"Question: What time period did you have that position?" "Answer: From May of '83 until April of '84."

Page 6: "What's your position now"—Page 6, Line 1, "What is your position now?" "Answer: Credit Supervisor."

"Question: So whoever is the Customer Accounts Supervisor is the one who is in charge of repossession?" "Answer: Yes."

Page 7, Line 2, "Question: And you previously answered some Interrogatories. Do you recall those questions that I submitted?" "Answer: I didn't until I reviewed them."

"Question: Is there any changes that you think needs to be made in those answers at this time?" "Answer: No."

\*    \*    \*    \*    \*.    \*

Page 24, starting with Line 7, question by Gary Collins, " 'I see how you are reading that, but we were told that this was it, we had everything. Obviously we weren't given everything. This was handwritten in here, 9—this was handwritten in here, " '9-8. I guess that is September 8th of '83, 'agent spoke with Mayo.' Is that you?" "Answer: Yeah, 'spoke with Mayo.' "

On Page 25, commencing with Line 2, "is that your handwriting?" "Answer: No."

"Whose handwriting is it?" "I believe that is Chris Labrusio's. I don't know for a fact, but I believe that's who it is."

"Do you know what Chris Labrusio told him in response to his information?" "I spoke to him. It would have been myself that spoke to him on that occasion. I don't recall, offhand, any conversation I had after he told me that. I believe—"

"Question: You spoke to him, but Chris Labrusio made a note of it?" "Answer: Right."

"Question: Is there any other notes, other than this one here of the conversation with whatever this fella's name really is, with Federal Recovery?" "Answer: Dave Ryan."

"Qeustion (sic): Any other notes that you can think of in the file?" "Answer: No."

"Question: The next entry is on 9-9, Sheriff's Department calls." "C.L.D. called, yes."

"Question: Who called? Did the Sheriff's Department call you, or somebody from your office called the Sheriff's Department?" Page 26, Line 1, "Answer: No. They called us. They called us."

Continuing on the same page, 26, "Question: It also says, 'Truck missing, called agent.' Who is the agent?" "Answer: That is referring to Federal Recovery."

"Question: You called the agent?" "Answer: The Sheriff's Department called us and indicted the truck was reported missing, and they wanted—it's customary that they'll call to see if the lienholder has taken possession of it. In that case we turned around and called the Federal Recovery and verified that they had, in fact, taken possession of it."

Page 29, Line 24, "Do you know how many times Mr. Scott made either a written or an oral complaint to your company about what"—continued on Page 33—"about what he said was a problem with the truck's performance?" "Answer: To Ford Credit itself?"

"Question: Yes. I could probably tell you if I was able to look through there."

"MR. JAMES W. HUMPHREY: 'Through there,' you are meaning the records that the attorney is holding?" "Answer: Yes. Okay."

"These records that I am holding here, these computer print-outs from Dearborn, they are telling you how many times he contacted the office?" "Answer: They should. I believe there was one other—on six occasions."

"Question: May I see that back again, please? That would have started sometime after he purchased it on up through at least the date of repossession?" "Answer: Uh-huh."

"Question: Does that include any complaints that he would have made to Ford

Motor Company?" "Answer: Those again are complaints to Ford Credit about the truck. I'm not aware of how many different occasions, if any, he spoke to Ford Motor Company."

"Question: We know that he did have the vehicle and had it looked at at different places including back at Chanute and Midway Ford; is that right?" Page 31, Line 1, "Answer: Yes."

Page 38, Line 17—Page 38, Line 17, "Question: I will show you Plaintiff's Exhibit No. 2. This looks like a form from Federal Recovery Bureau, Inc., and that show the date of repossession as being September 1983; is that correct?" "Answer: Yes."

"Question: As part of your business records in your file?" "Answer: Yeah. That actually refers to the date that this report was done."

"Question: Tell us what date the actual repossession took place." Page 39, Line 1, the answer is, "In this case it was the same, I believe, September 9."

"Question: Do you know what time of day it occurred?" "Answer: It was early in the morning."

"Question: This shows the Clay County Sheriff's Department, at 3:55 hours." "Answer: That would have been 3:55 a.m."

"Question: In the morning?" "Answer: Yeah."

"Does that tell you the repossession was very close to that time?" "Answer: Yes."

Page 43, Line 20, "I will show you what's been marked as Plaintiff's Exhibit No. 4, at Federal Recovery Bureau, form entitled 'Invoice,' also dated September 9." "The only difference between it and some others is down at the bottom. Well, these have some prices for the services, too, I see."

Page 44, starting at Line 1 at the bottom, it has "Four round trips were necessary to secure unit. Is that self-explanatory? They went out there four times to try to pick it up?" "Answer: Yeah. That's what they are saying they had to

make four different trips to where the truck was located, before they were able to secure it."

Page 45, Line 19, "Were they paid mileage?"

"Answer: They were paid a delivery charge"—

MR HUMPHREY: What page?

MR. COLLINS: Page 45, Line 19.

"Question: Were they paid mileage?"

"Answer: They were paid a delivery charge to to (sic) move the truck to Merle Kelly Ford. Then they were paid for 240 miles at 50 cents a mile, which would be referring to the four trips that they made to where the truck was located. They were paid for that."

Continuing on over to Page 46, Line 1, "Question: Would they be paid for every mile they put in, even if a—in this case they had had three unsuccessful trips? Were they paid for their mileage on those three unsuccessful trips?" "Answer: Yes, sir, it appears they were."

"Question: Is that normal?" "Answer: Yes, it is."

"Question: So you do, then, pay them for mileage, even if they are unsuccessful on a trip?" "Answer: Not if they are ultimately unsuccessful in recovery a vehicle."

"Question: So, if they are ultimately successful, then you do pay them every mile that they put in?" "Answer: Yes."

"Question: But if they are unsuccessful, they don't get a dime; is that right?" "Answer: Right."

"Plaintiff's Exhibit 32, Page 2, the bottom part there, reading from this Deposition—not the deposition, but Exhibit 32, the customer's records, business records of Ford Motor Credit, as follows, 'Ford rep has seen. Problem is that customer didn't buy right truck. The truck he has performs fine, just won't do what customer is asking of it,' bearing the date of 8-23. Also from the same business records of Ford Motor Credit Company, under date of August 23, same records— 'I don't know what page it is'—'MR. HUMPHREY: The date of entry anyway

of August 23.' 'Call dealer. Advise Dick Kelly. He agreed to resolve account.'"

"Next entry is August 24, 'assigned to Carl. He to run after August 26, '83.' Next entry August 27th, states, 'Call Carl. Talked to Donna. He is going to run Sunday night.' Next entry is August 29. 'Talked to Carl. He will run tonight.' I don't see any others."

Previous to trial, Ford had moved to amend the answer to the first interrogatory referenced above. This request was denied. Ford proceeded to introduce its evidence. In summary, the relationship between Ford and Federal was shown to have been one of independent contract and not agency.

On this appeal, Scott suggests there was sufficient evidence to submit the question of agency to the jury. First, he contends that the use of the term "agent" by Ford, upon its records in reference to an employee of Federal (and again stated by interrogatory) is proof of agency. He then refers to the deposition of Ford employee Mayo where Mayo is asked if any changes to interrogatories were necessary, and Mayo answered, "No." Scott then refers to Ford's records which disclosed, "Agent spoke with Mayo. Gate open. Will try to get tonight," and again, ... "truck missing, called agent."

From the foregoing, Scott concludes agency is established. He then argues that Ford and Federal committed a trespass, thus making both liable. He provides the following from the transcript:

Q. ... the truck was finally repossessed on the 9th of September?

A. Yes sir.

Q. At about what time?

A. I believe just before 4:00 in the morning, 3:55, as I recall.

Q. 3:55, and you will agree to this, that it is awful dark at that time, in September?

A. Sure.

Q. The statement in your records on 9–8 here, and I am again reading from 32, I am just reading a copy here, but I am still reading from Exhibit 32. Read that to me, so that there is no problem here, 9–8, what does it say there?

A. "The agent spoke with Mayo." That's me.

Q. Who is that?

A. Dave.

Q. And who is the agent?

A. That would be referring to Federal Recovery Bureau.

Q. Okay. That is the agent, though, that you are referring to?

A. That is how we refer to them.

Q. And what is that?

A. "Spoke with Mayo."

Q. Spoke with Mayo?

A. Yes, sir.

Q. So you don't argue about that, do you?

A. No, I don't deny that he spoke with me.

Q. And "Gate open" what did that mean to you?

A. That meant that the gate surrounding the area where the truck was had been or was open.

Q. Did it mean to you, also, that if the gate were open, that it was still on Scott's private property?

A. Yeah. Yeah, it would be there in that yard. Yes, sir.

Q. "Will try to get tonight"?

A. Sure.

Q. If you hadn't wanted him to get it tonight, you would have told him so, wouldn't you?

A. If I wanted to fire him, yes.

Q. (By Mr. Wright) But you acquiesced that he could get it tonight?

A. That was his opinion, not mine.

Q. You didn't vary from it, he did check with you, didn't he?

A. Yes, he talked to me, told me he thought he could get it that night.

Q. But you knew by the gate being open, that they would have to take off of Scott's property, didn't you?

A. Yeah. He was referring to the gate around the yard, so I assume—

Q. And you knew that was Scott's property, didn't you?

A. Yeah.

Q. And you had been told not to get the truck off of it, hadn't you?

A. I think, of course—actually what we were told is, if we wanted to, we'd better bring a gun. I don't know exactly what that means.

■ Ford and Scott both correctly point out the critical element which establishes the existence of an agency relationship, to wit, the right to control the physical conduct of the agent in the performance of the service for the principal. *See* Restatement (Second) of the Law of Agency, § 2 (1958). It is the element of control and the extent of that control which must be shown to establish an agency.

■ It is best, perhaps, to summarize the facts applicable herein. It is clear from the whole of the evidence that Ford entered into an agreement with Federal for the latter to take into possession Scott's truck upon default in payment by Scott. That agreement provided Federal would be responsible for the acts of its employees. It is obvious that Federal made entry onto Scott's real property by cutting a chain used to lock the main gate. It is obvious that Federal had the employees and tools to accomplish the act and Ford did not. It is also obvious from the evidence that the method and time of gaining possession were in the exclusive control of Federal. The above reference to conversation between employees of Ford and Federal was a report from the latter's employees in their attempt to gain possession of the truck. Scott's contention that Ford "controlled Federal" because Ford could have fired Federal, or could have told Federal not to get the truck or how to get the truck does not stand up in light of the evidence upon the record. As noted above, the reference to conversations between employees of Ford and Federal were reports by the latter to the former. These reports do not reveal either actual control or right to control. The evidence reveals that Ford contracted with Federal for the latter to repossess the Scott truck. The methods, times and persons to complete the act were the responsibility of Federal without control or direction by Ford.

An independent contractor has, by the restatement, 2A C.J.S. *Agency* § 12 (1972), been defined as:

(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. Restatement (Second) of the Law of Agency, § 2 (1958).

There is, from the whole of the evidence upon this record, no evidence that Ford ever had the control or right of control with respect to the physical conduct of Federal in gaining possession of the Scott truck. In addition to the restatement provision, it has been held that one who hires an independent contractor is not responsible for the wrongs committed by the independent contractor. *See Kourik v. English*, 340 Mo. 367, 100 S.W.2d 901, 905 (1936).

The evidence herein reveals that Ford only supplied the name of the debtor, Scott, his address, telephone number, and a description of the truck. There was no evidence as to how the truck was to be repossessed or when. The repossession, under the evidence, was left to Federal under its contract or agreement with Ford.

The evidence revealed that the chain to Scott's premises was cut. In addition, Scott testified that he had locked the truck and had the keys in his possession. The evidence further revealed that entry to Scott's premises and removal of the truck required special tools. No evidence was offered to show that Ford possessed any tools for such performance, but that the evidence did show Federal did. Thus, it was not shown that Ford supplied any instruments or tools to perform the task. 2A C.J.S. *Agency* § 12 (1972).

Further, the testimony revealed, "We [meaning Ford] didn't try or presume to be

able to tell them [meaning Federal] how to do it." This relates to the skill or performance of the task (i.e., gaining entry to the premises and the truck along with the removal of the latter) which must be shown in the establishment of agency. *Id.*

The evidence further revealed that Federal was hired and paid by the job. *Id.*

It is from the particular facts and circumstances of each case that an agency relationship must be determined. *Kourik, supra.*

Herein, the evidence upon the whole of the record viewed to the favor of Scott not only fails to establish that Federal was the agent of Ford but to the contrary, the evidence reveals that Federal was an independent contractor and thus responsible for its own conduct and acts.

The trial court herein erred when it failed to direct a verdict for Ford at the close of Scott's case, and at the close of all the evidence, and again by its failure to enter a judgment N.O.V. to the favor of Ford.

The judgment is in all respects reversed.

All concur.